(No. 76737.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. JOHN SHERMAN COLE, JR., Appellant.

*Opinion filed March 28, 1996.—Rehearing denied June 3, 1996.*

86

Charles M. Schiedel, Deputy Defender, and Steven L. Clark, Assistant Defender, of the Office of the State Appellate Defender, of Chicago, for appellant.

James E. Ryan, Attorney General, of Springfield, and Kathryn Dobrinic, State's Attorney, of Hillsboro (Barbara A. Preiner, Solicitor General, and Arleen C.

Anderson and Martha E. Gillis, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

Following a bench trial in the circuit court of Montgomery County, the defendant, John Sherman Cole, Jr., was convicted of two counts of first degree murder, two counts of home invasion, and one count of aggravated kidnapping. A jury subsequently determined that the defendant was eligible for the death penalty and that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant was accordingly sentenced to death for the two first degree murder convictions and to sentences of imprisonment for the other offenses. The sentence of death has been stayed pending direct review by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d Rs. 603, 609(a). For the reasons that follow, we affirm the judgment of the circuit court as modified.

The facts in this case may be briefly stated. The crimes for which the defendant was convicted occurred on February 9 and 10, 1993, in Montgomery County. The defendant was arrested on February 11, 1993, in Saline County, Missouri, where he gave law enforcement officers a confession to the crimes. The victims were the mother and brother of the defendant's former girlfriend, Stacey Caulk. The principal evidence at trial consisted of Stacey's eyewitness testimony and of the defendant's inculpatory statements.

Stacey Caulk described her relationship with the defendant, as well as the events leading up to the defendant's commission of the crimes involved here. Stacey and the defendant met in November 1990, and they began living together the following July. She moved out in May 1992, because he was abusive to her. In November 1992, Stacey obtained an order of protection against

him. Stacey would agree to see the defendant from time to time, however. On February 9, 1993, Stacey told the defendant that she would pick him up that evening. She did not intend to do so, however, and instead went to the home of an acquaintance. The defendant found her there later, and she refused to go with him. The defendant had to be asked to leave. As the defendant left, he said that he would be at Stacey's house when Mrs. Caulk got home from work. Mrs. Caulk's shift at a local factory ended at 11 p.m.

Stacey later picked up her brother, Shane, who was 15 years old, and returned home. There, her mother, Ruth Caulk, and Ruth's boyfriend were talking to a police officer about an earlier incident in which the defendant had broken some dishes. After the police officer and Mrs. Caulk's friend left, Stacey went up to her bedroom, where she discovered the defendant hiding in the closet. Stacey screamed and ran down the stairs, and the defendant followed her, carrying a shotgun. The defendant fired the gun at Mrs. Caulk, killing her, and shot Shane in the arm. The defendant also ran after Shane and punched him several times. The defendant later told Stacey to wrap a cloth around Shane's injured arm.

The defendant then told Shane and Stacey that he was going to make them watch him commit suicide. He ordered the brother and sister into the car, and they drove to the home of a friend with whom the defendant had been living. The defendant obtained some clothing, and they then left. The defendant was sitting in the back seat, and Stacey and Shane were in the front seat; Stacey was driving. The defendant mentioned taking Shane to a hospital. Later, however, the defendant directed Stacey to an isolated area known as "Lover's Lane." The defendant got out of the car there and told Stacey to help Shane out of the car. After searching Sta-

cey's pockets for identification, the defendant told Stacey to check Shane's pockets. The defendant then told Stacey to return to the car. Later, Shane came over and knocked on Stacey's window. She got out of the car, and they hugged and kissed each other until the defendant said, "That is enough, get back in the car." The defendant then shot Shane. According to the evidence from the autopsy, the fatal shot was a contact wound from the back to the base of the skull.

The defendant and Stacey then returned to the Caulk residence, where Stacey picked up some clothing. They cashed checks at local gas stations and then drove to western Missouri, where they were found by law enforcement authorities on February 11. At one point they stopped to use the restroom, and Stacey left a note there asking for help and describing their car. Stacey testified that she did not try to escape during the time she was with the defendant because she was afraid of what he might do to her.

The defendant's statements were also introduced into evidence. In an initial statement to Missouri law enforcement officers following his arrest in that state, the defendant said that Ruth Caulk was killed as he fought with Ruth's friend for control of the gun, and that Stacey later shot Shane. In a second statement in Missouri, however, the defendant admitted killing both Ruth and Shane. The defendant later gave a statement in Montgomery County, in which he said that the shooting of Ruth was accidental and that Stacey shot her brother.

Forensic evidence from the investigation of the offenses was introduced by way of stipulation. The defendant did not present any evidence. At the conclusion of the trial, the judge found the defendant guilty of all 13 counts in the indictment. Because the murder of each victim was alleged in five different counts, the court

entered judgment on only one count with respect to each of the victims. The judge also entered judgment on two counts of home invasion and one count of aggravated kidnapping.

The capital sentencing hearing was conducted before a jury. At the first stage of the hearing, the jury heard testimony describing his convictions for the offenses charged here, as well as testimony relating his inculpatory statements to these crimes. Evidence was also introduced establishing that the defendant was born in December 1973 and therefore was 18 years or older at the time of the present offenses. See 720 ILCS 5/9—1(b) (West 1992). At the conclusion of the first stage of the hearing, the jury determined that the defendant was eligible for the death penalty on four separate grounds: the murder of two persons, the murder of Shane Caulk in the course of the felony of aggravated kidnapping, the murder of Ruth Caulk in the course of the felony of home invasion, and the murder of Shane Caulk to prevent him from assisting an investigation or prosecution. 720 ILCS 5/9—1(b)(3), (b)(6), (b)(8) (West 1992).

At the second stage of the sentencing hearing, Stacey Caulk testified once more to the events surrounding the defendant's commission of the crimes. Stacey and her father, Lonnie Caulk, also described the impact of the crimes on their lives, and Ruth Caulk's friend described his discovery of Ruth's body the day following the murder.

The defendant introduced evidence in mitigation. This included testimony describing his upbringing, as well as his relationship with Stacey and her family. The defendant's parents, who divorced when the defendant was less than a year old, were drug users who encouraged the defendant to use drugs and alcohol. At various times the defendant lived with his mother, an aunt and uncle, his grandparents, and his father. The defendant

left school when he was 16. The defendant did not testify at the sentencing hearing. Friends and relatives of the defendant, however, described his love for Stacey and the importance of that relationship to him.

At the conclusion of the second stage of the sentencing hearing, the jury determined that there were no mitigating circumstances sufficient to preclude a sentence of death. Accordingly, the trial judge sentenced the defendant to death for the murders of Ruth and Shane Caulk. Later, at a separate hearing, the trial judge sentenced the defendant to extended terms of 60 years' imprisonment for each of the two home invasion convictions and to an extended term of 30 years' imprisonment for the aggravated kidnapping conviction, with those three sentences to run concurrently.

# I

The defendant raises a number of arguments concerning his convictions and death sentence, and we will consider these issues in the sequence in which they appear in the defendant's brief. The defendant first contends that the trial judge erred in denying his motion to suppress statements. The defendant asserts that law enforcement authorities failed to honor his request that questioning cease. The defendant raised this issue in advance of trial, moving to suppress his statements. The defendant did not testify at the suppression hearing, relying instead on the contents of his videotaped statements and on the testimony of the Missouri officers who questioned him. Following an evidentiary hearing, the trial judge denied the defendant's motion.

The defendant was arrested in Saline County, Missouri, on February 11, 1993, by Missouri Highway Patrol officers and was taken to a police station. After waiving the *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)), the defendant provided the Missouri officers with an oral statement,

which was videotaped. In the statement, the defendant said that Ruth Caulk had been shot while he and Ruth's boyfriend struggled over a gun, and that Shane Caulk had been shot by Stacey Caulk. After viewing the videotaped statement, FBI agents, who were investigating possible kidnapping charges in this case, told the defendant that his account did not match the physical evidence. According to a Missouri officer who was present at the time, the defendant responded, "I don't want to talk to you guys" and made a gesture or motion at the agents. One of the FBI agents commented that it would hurt when the needle was put in the defendant's arm, and the agents then left.

Following the departure of the FBI agents, a Missouri officer came into the room and told the defendant that the Missouri officers did not believe the videotaped statement. The defendant agreed to make another videotaped statement but said that he first wanted to call his grandfather, in Illinois. The telephone call was placed, and the defendant was overheard saying that he did not want to talk to the FBI agents but that the Missouri officers were treating him well and that he would tell them the truth. After the call was completed, the defendant waived his *Miranda* rights once more and was questioned further by the Missouri officers. In the second videotaped statement the defendant said that the first videotaped statement contained falsehoods and that it was he who shot Ruth and Shane Caulk.

The defendant argues that he asked that questioning cease and that the Missouri officers, by persisting with their request that he undergo a second videotaped statement, failed to honor that demand. See *Michigan v. Mosley*, 423 U.S. 96, 46 L. Ed. 2d 313, 96 S. Ct. 321 (1975); *People v. R.C.*, 108 Ill. 2d 349 (1985). The defendant contends that his second videotaped statement should therefore have been suppressed.

We do not agree with the defendant that he requested that all questioning cease. The dispute here centers on whether the defendant's statement, "I don't want to talk to you guys," extended generally to all questioning by any law enforcement officers, as the defendant argues, or whether it pertained only to questioning by the FBI officers, as the State asserts. We believe that the reference to "you guys" meant agents from the FBI, and that the defendant's refusal to talk applied only to the FBI agents. This conclusion is reinforced by other testimony presented at the suppression hearing. Earlier that evening, prior to the appearance of the FBI agents, the defendant told a Missouri officer that he would talk to the State troopers but not to the FBI. Following the departure of the FBI agents, the defendant called his grandfather, a former police officer, and was overheard saying that he did not want to talk to the FBI but that the Missouri officers were treating him well and that he would tell those officers the truth. Accordingly, we do not believe that the defendant asked that all questioning cease; the defendant's request was limited to interrogation by the FBI, and that request was honored. The trial judge's determination was not against the manifest weight of the evidence. See *People v. Brown*, 136 Ill. 2d 116, 125 (1990); *People v. Davis*, 95 Ill. 2d 1, 25 (1983).

## II

The defendant next argues that a prospective juror, Carol Millburg, was improperly excused from service on the jury selected for the sentencing hearing. The judge removed the juror because of her views toward capital punishment, and the defendant argues that the juror did not express a disqualifying view on that subject. The relevant portion of the juror's *voir dire* follows:

"THE COURT: Is there anything about the nature of the charge in this case that would prevent you from rendering a fair and impartial decision?

A. I don't know that I really believe in the death penalty, so that might be a problem. I—

THE COURT: I will ask you about it.

A. Oh, okay.

THE COURT: Do you have any personal, moral or religious beliefs against imposition of the death penalty?

A. Yeah, I mean, I don't really believe in it.

THE COURT: All right, then we won't argue that.

A. Okay.

THE COURT: Would your opposition or hesitancy to the death penalty be such that it would interfere with your ability to be a fair and impartial juror?

A. It, I think it could be.

THE COURT: Is that opposition such that you would automatically vote against the sentence of death regardless of the facts in this case?

A. No.

THE COURT: So you could consider the facts?

A. Yeah, I could consider the facts.

THE COURT: If you first found that the defendant is eligible for the death penalty and then found that there were no mitigating factors sufficient to preclude the imposition of a death sentence, would you be able to follow the law and instructions and vote to impose the death penalty?

A. Yes.

THE COURT: Would you automatically vote to impose the death penalty regardless of the aggravating and mitigating factors?

A. No.

THE COURT: If your decision was to impose the death penalty, would you be able to sign a death verdict?

A. No, I don't think. I don't know.

THE COURT: All right.

A. I don't know how I would feel, I mean, you know—

THE COURT: And we, obviously, we have to know that now. If your verdict is to impose the death penalty, would you be able?

A. I don't think I would.

THE COURT: I will excuse you.

A. Okay."

A member of the venire may not be removed for cause simply because the person has scruples against capital punishment. *Witherspoon v. Illinois*, 391 U.S. 510, 522, 20 L. Ed. 2d 776, 784-85, 88 S. Ct. 1770, 1777 (1968); *People v. Seuffer*, 144 Ill. 2d 482, 505 (1991). In determining whether a prospective juror may be removed for cause because of the person's views toward the death penalty, the "standard is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'" *Wainwright v. Witt*, 469 U.S. 412, 424, 83 L. Ed. 2d 841, 851-52, 105 S. Ct. 844, 852 (1985), quoting *Adams v. Texas*, 448 U.S. 38, 45, 65 L. Ed. 2d 581, 589, 100 S. Ct. 2521, 2526 (1980).

This court has previously noted that the trial judge is in a "superior position to gauge the meaning of the prospective juror's responses" during *voir dire*, and the judge's determination whether a particular juror is subject to removal will therefore be granted deference. *People v. Emerson*, 122 Ill. 2d 411, 439 (1987). In deciding whether a prospective juror may be excused because of his or her views toward capital punishment, a court must consider the person's remarks as a whole. *People v. Pitsonbarger*, 142 Ill. 2d 353, 386 (1990); *People v. Gaines*, 88 Ill. 2d 342, 356-57 (1981). A trial judge need not follow a set formula in posing questions on *voir dire*, and it may be appropriate to exclude a prospective juror even though the person has not expressed his or her views with meticulous precision. *People v. Szabo*, 94 Ill. 2d 327, 354 (1983); *People v. Gaines*, 88 Ill. 2d 342, 356 (1981).

Turning now to the merits of the trial judge's ruling, we believe that removal of the prospective juror in question was proper. Considering the entirety of venire member Millburg's responses during *voir dire*, we do not believe that the trial judge erred in excusing her for

cause because of her views toward capital punishment. In the present case, Millburg initially stated that her views on the death penalty could affect her ability to be a fair and impartial juror. Later, she said that she would be able to vote to impose the death sentence in an appropriate case. Upon further questioning, however, she stated that she did not think that she would be able to sign a verdict imposing the death sentence. Thus, although the venire member at one point stated that her views would not affect her ability to act as a juror, a review of her comments as a whole indicates otherwise. Accordingly, prospective juror Millburg was properly excused for cause.

### III

The defendant was convicted of the first degree murders of Ruth and Shane Caulk. The defendant was also convicted of two counts of home invasion stemming from his presence in the Caulk residence, with one count alleging the infliction of harm on Ruth Caulk, and the other count alleging the infliction of harm on Shane Caulk. The defendant argues that the murder of Ruth Caulk was based on the same act of violence alleged in the first home invasion count, and the defendant maintains that the first home invasion conviction must therefore be vacated. See *People v. Johnson*, 154 Ill. 2d 356, 370 (1993).

As a preliminary matter, we note that multiple counts alleged the defendant's commission of the murders under different theories, including intentional and knowing murder and felony murder; while the judge believed that each count had been proved, he entered judgment on only one count with regard to each victim. With respect to Ruth Caulk, the court entered judgment not on the felony murder count but on a count alleging first degree murder under section 9—1(a)(2) of the Criminal Code of 1961 (720 ILCS 5/9—1(a)(2) (West 1992)

(knowledge that acts create strong probability of death or great bodily harm)). At oral argument the State agreed with the defendant that home invasion is an included offense of felony murder based on home invasion. The State contends, however, that the remaining counts alleging Ruth's murder would not be affected by the defendant's analysis. We need not determine in this case whether home invasion, based on the murder of the victim, is an included offense of a charge of murder involving that victim, for we find instead that one of the two home invasion convictions must be vacated for a different reason, and we vacate the count involving the infliction of harm on Ruth.

The defendant was charged with and convicted of two counts of home invasion, both stemming from his entry into the Caulk home. Count XI of the indictment was based on the infliction of injuries on Ruth Caulk, and count XII was based on the infliction of injuries on Shane Caulk. At the conclusion of the guilt phase of the proceedings, the trial judge found the defendant guilty of both home invasion counts and entered judgment on those findings. The trial judge later sentenced the defendant to concurrent 60-year terms of imprisonment for those two offenses. The defendant argues that there can be only one conviction for home invasion in the wake of a single entry into a residence, regardless of the number of persons inside.

The appellate court has addressed the question a number of times, and in each case has concluded that the home invasion statute will support only a single conviction in the circumstances shown here. See, *e.g.,* *People v. Palacio*, 240 Ill. App. 3d 1078, 1088-89 (1993); *People v. McDarrah*, 175 Ill. App. 3d 284 (1988); *People v. Parker*, 166 Ill. App. 3d 123 (1988); *People v. Yarbrough*, 156 Ill. App. 3d 643 (1987); *People v. Morrison*, 137 Ill. App. 3d 171, 177-78 (1985); *People v. Ammons*,

120 Ill. App. 3d 855 (1983). The rationale for this view is found in the legislature's description of the elements of the offense: the home invasion statute speaks of a defendant's entry of, or presence in, a dwelling when the defendant knows or has reason to know "that one or more persons is present" and, further, of the defendant's use or threat of force while armed "upon any person or persons" in the dwelling, and of the defendant's intentional injury of "any person or persons" in the dwelling. 720 ILCS 5/12—11 (West 1992). These references to one or more persons in the dwelling signify that a single entry will support only a single conviction, regardless of the number of occupants. We find this reasoning persuasive, and we agree with the defendant that he cannot be convicted of more than one count of home invasion in this case. Accordingly, we must vacate one of the convictions and sentences for that offense. We vacate here the conviction and sentence for count XI, based on the injury of Ruth Caulk.

The defendant notes further that one of the statutory aggravating circumstances established in the present case alleged the murder of Ruth during the commission of the felony of home invasion. See 720 ILCS 5/9—1(b)(6) (West 1992). The defendant argues that the failure of the home invasion count involving Ruth Caulk must vitiate the eligibility determination and death sentence. We do not agree.

The jury returned separate verdict forms finding that other, valid statutory aggravating circumstances existed in this case, and the jury's determination that the defendant was eligible for the death penalty should therefore remain unaffected by the elimination of one of the aggravating circumstances. "The Illinois death penalty statute does not place special emphasis on any one aggravating factor and does not accord any special significance to multiple aggravating factors as opposed

to a single aggravating factor." *People v. Page*, 156 Ill. 2d 258, 268-69 (1993). Thus, the defendant would remain eligible for the death penalty, even if one of the statutory aggravating circumstances found by the jury is invalid.

Nor do we believe that our action here affects the jury's subsequent finding that death was the appropriate punishment. Unlike the sentencing jury in *People v. Brownell*, 79 Ill. 2d 508 (1980), cited by the defendant, the sentencing jury in the present case would not have been considering matters not supported by the evidence. The jury was free to consider the circumstances of the criminal conduct shown here, and the vacatur of one of the defendant's home invasion convictions, as well as the elimination of one of the statutory aggravating circumstances, does not reduce that evidence.

Alternatively, even if the jurors might have believed that they were to weigh the aggravating circumstances in deciding whether the defendant should receive the death penalty, we do not believe that a new sentencing hearing is necessary in this case. See *Clemons v. Mississippi*, 494 U.S. 738, 741, 108 L. Ed. 2d 725, 733, 110 S. Ct. 1441, 1444 (1990). Any error in this regard was harmless beyond a reasonable doubt. The additional aggravating circumstance challenged here was a minor part in the prosecution's case, and the State presented overwhelming evidence in aggravation. We do not believe that the absence of the challenged circumstance would have had any effect on the jury's decision to sentence the defendant to death. As we discuss later in this opinion, we also believe that death is an appropriate sentence in this case. See *People v. Pitsonbarger*, 142 Ill. 2d 353, 376-77 (1990).

## IV

The defendant argues that the acts alleged to constitute the aggravated kidnapping of Shane Caulk were incidental to Shane's murder and not a separate offense.

Accordingly, the defendant argues that the aggravated kidnapping conviction must be vacated, as well as the aggravating circumstance alleging the defendant's murder of Shane during the commission of another felony, in this case, aggravated kidnapping.

This court has previously stated that "an aggravated kidnapping conviction should not be sustained where the asportation or confinement may constitute only a technical compliance with the statutory definition but is, in reality, incidental to another offense." *People v. Enoch*, 122 Ill. 2d 176, 197 (1988). See also *People v. Eyler*, 133 Ill. 2d 173, 200 (1989). We do not believe that the confinement of Shane was merely incidental to the offense of his murder, and therefore we uphold the defendant's conviction for aggravating kidnapping.

The defendant maintains that when he, Stacey, and Shane drove from the Caulk residence, his initial intent was to either kill himself or to take Shane to the hospital. The defendant notes that he could have killed Shane at the house but did not, and instead had Stacey bind Shane's injured arm with a cloth. The defendant refers also to the portion of his statement in which he said that he decided to kill Shane after Shane mentioned in the car that he would go to the police. The defendant contends that the asportation and confinement of Shane did not constitute a separate offense but were simply incidental to this unplanned sequence of events.

The aggravated kidnapping charge in the present case alleged that the defendant "knowingly and secretly confined Jeffrey Shane Caulk against his will." See 720 ILCS 5/10—1(a)(1) (West 1992). We see no reason here to disturb the trial judge's finding. The record contains sufficient evidence from which the judge could have concluded that the defendant's actions constituted aggravated kidnapping, and that the confinement of Shane in the car was not merely incidental to another offense.

After shooting and killing Ruth Caulk and shooting and injuring Shane Caulk, the defendant ordered Stacey and Shane to "go for a ride" with him. The defendant sat in the back seat of the car holding the gun, while Stacey drove and the injured Shane sat in the front passenger seat. The defendant eventually directed Stacey to drive to an isolated area referred to in the record as "Lover's Lane," where the defendant ordered Shane from the car and then shot and killed him.

## V

The defendant makes a further challenge to one of the statutory aggravating circumstances on which his eligibility for the death penalty was based. The defendant argues that the gunshot that killed Ruth Caulk might have been fired accidentally, and thus he contends that, with respect to her death, he did not possess the mental state required by the multiple-murder aggravating circumstance.

Section 9—1(b)(3) of the Criminal Code of 1961 authorizes the imposition of the death penalty on a defendant who has murdered more than one person, "so long as the deaths were the result of either an intent to kill more than one person or of separate acts which the defendant knew would cause death or create a strong probability of death or great bodily harm to the murdered individual or another." 720 ILCS 5/9—1(b)(3) (West 1992).

In arguing that the requisite mental state for the murder of Ruth Caulk was not established, the defendant points to testimony introduced at trial and sentencing suggesting that the shotgun discharged as Stacey Caulk attempted to pull the weapon from him. On cross-examination at trial, Stacey testified that she grabbed the shotgun and tried to pull it so that the defendant would not shoot her mother; according to Stacey, the gun discharged at the same time she grabbed it. At the

second stage of the sentencing hearing, Stacey testified that she ran to where the defendant was standing and tried to pull the gun up so that Ruth would not be shot. The defendant notes further the testimony of a Missouri trooper, presented at the first stage of the sentencing hearing, who related Stacey's comment that the gun went off when she grabbed it. Finally, the defendant cites his own statement to Montgomery County authorities, in which he said that he shot Ruth accidentally. The defendant maintains that the record is unclear whether he knowingly or intentionally fired the gun at Ruth Caulk or whether, instead, Stacey jarred the gun, causing it to discharge.

We do not agree with the defendant that the evidence in this case raises a reasonable doubt whether the defendant acted with the requisite state of mind in shooting Ruth. On direct examination at trial, Stacey testified that as she tried to pull the gun the defendant shot her mother in the mouth. Later, on redirect examination, Stacey responded affirmatively when she was asked whether before she put her hands on the gun the defendant was holding it level with Mrs. Caulk's head, and whether the defendant pulled the trigger. She again explained that she was trying to grab the gun so that the shot would not hit her mother. Moreover, at the second stage of the sentencing hearing, Stacey said that she was unable to move the gun when she grabbed it. Stacey's testimony shows that the gun was already pointed at Mrs. Caulk when Stacey attempted to grab it, that Stacey was unsuccessful in her efforts to move the weapon, and that the defendant pulled the trigger.

Other evidence, too, demonstrates that the defendant was acting in a knowing or intentional manner when the gun was fired. The autopsy report showed that Ruth was holding her hands in front of her face, with the palms outward, when the shot was fired. In addi-

tion, Stacey testified that her mother exclaimed, "Oh, my God, no," just before the shot went off. The autopsy revealed that Ruth was shot in the mouth, and that her mouth was open when the shot hit her. The defendant, in his second videotaped statement to the Missouri officers, admitted that he shot Ruth, and he did not mention that Stacey grabbed the gun. The evidence also shows that the defendant was angry with Ruth because of her supposed interference in his relationship with Stacey. The testimony on this issue is conflicting, and it was within the jury's province to determine whether the defendant possessed the necessary mental state when Ruth Caulk was shot and killed. On this record, we cannot say that the prosecution failed to prove this circumstance beyond a reasonable doubt.

## VI

The defendant next contends that the State presented irrelevant and prejudicial testimony and argument to the jury at the eligibility stage of the death penalty hearing. Specifically, the defendant complains that the prosecutor, in her opening statement, went beyond the proper scope of the first stage of the hearing by stating that the case was one in which death was the appropriate sentence. The defendant also complains of the State's presentation of evidence that the defendant claimed to be a drug dealer and that the defendant had sexual intercourse with Stacey Caulk sometime after the commission of the offenses involved here.

During opening statement the prosecutor said:

"I think you are going to learn that the law indicates in Illinois that when someone does die at the hands of another person, that does not automatically mean that the murderer, the death penalty will be sought against that person. However, I also think that during today and hopefully during the course of the days that follow, you are going to learn that there are occasions when someone does die at the hand of another person, that the law authorizes

imposition of the death penalty on that person. And I think you are going to also learn that when that is true, that there are cases, there are facts that demand that the death penalty be given to that person. I submit to you, ladies and gentlemen, that after hearing about what the law is as regards to the death penalty, and after hearing the facts in this case, that you will be convinced that this is a case, this is a death penalty case, this is the type of killing that the law states and authorizes the death penalty is the proper sentence for."

Citing *People v. Williams*, 161 Ill. 2d 1, 60-62 (1994), the defendant argues that the preceding comments introduced extraneous issues into the jury's consideration and diverted the jurors' attention from the task of determining whether the defendant was eligible for the death penalty.

We do not believe that the prosecutor's comments were improper or could have had the effect feared by the defendant. In the passage cited by the defendant, the prosecutor was providing the jury with a brief outline of the procedures for death penalty hearings. The prosecutor went on to correctly explain that the first stage of the hearing concerned only the defendant's eligibility for the death penalty, and not the separate question whether the defendant should receive the death penalty. The prosecutor then addressed the four statutory aggravating circumstances the State was seeking to prove at the first stage of the hearing, as well as the requirement that the defendant was 18 years or older at the time of his commission of the murders. At the conclusion of her remarks, the prosecutor again reminded the jury that the issue was not then whether the defendant should receive the death penalty, but simply whether he was eligible for it. Defense counsel, in his own opening statement, also referred to the distinct functions and different purposes of the two stages of the bifurcated sentencing hearing.

For these reasons, the present case is readily distin-

guishable from *People v. Williams*, 161 Ill. 2d 1, 60-62 (1994), cited by the defendant. The prosecutor in that case used her opening statement at the eligibility stage of the capital sentencing hearing to argue that the defendant should receive the death penalty, and in that manner strayed from the threshold question whether the defendant was eligible for that sentence. See *Williams*, 161 Ill. 2d at 61 ("Indeed, her brief argument focused almost entirely on matters not relevant to the narrow issue for consideration by the jury at that stage of the sentencing proceeding"). Other error, too, occurred during the course of the hearing, and the *Williams* court concluded that a new sentencing hearing was necessary. *Williams*, 161 Ill. 2d at 81. Unlike the prosecutor in *Williams*, the prosecutor in the present case carefully observed the distinctions between the two stages of the sentencing hearing and did not attempt to accomplish in the first stage what is appropriate to the second.

The defendant also contends that the State presented irrelevant evidence at the eligibility stage of the hearing. Specifically, the defendant argues that the State erred in introducing evidence that the defendant claimed to be a drug dealer and that the defendant and Stacey Caulk had sexual intercourse in her car several hours after the defendant's commission of the present offenses. This evidence was introduced through the playing of a videotaped statement given by the defendant to Missouri Highway Patrol officers on February 11, 1993, following his arrest in that state. We find no error in the presentation of this evidence. The remarks cited by the defendant were mentioned only fleetingly in the defendant's statement, which was said to be about a half hour in length. We find no support for the defendant's contention that those brief comments would have diverted the jury's attention from its consideration of

the proper issues at the first stage of the sentencing hearing.

## VII

The defendant next argues that the sentence of death he received for the first degree murders of Ruth and Shane Caulk is excessive. The defendant maintains that the circumstances of this case are similar to those of other cases in which this court has found the death sentence to be inappropriate.

The defendant asserts that the crimes were triggered by Stacey Caulk's refusal to go out with him that night, as she had previously agreed. His relationship with Stacey was especially important to him, the defendant maintains, because his childhood had been unstable and unloving. The defendant blamed Stacey's family for disrupting that relationship, and the defendant says that "[t]he shootings were his desperate attempt to hold on to that love." The defendant notes also that he did not have a criminal record prior to the commission of these offenses. In addition, the defendant refers to the testimony of his difficult upbringing, in which he was continually exposed to the drug and alcohol use of his parents, who permitted him to use those things.

The defendant argues that the mitigating circumstances in this case are as favorable to him as those of other cases in which our court has found death to be an excessive sentence. See *People v. Leger*, 149 Ill. 2d 355 (1992); *People v. Johnson*, 128 Ill. 2d 253 (1989); *People v. Buggs*, 112 Ill. 2d 284 (1986); *People v. Carlson*, 79 Ill. 2d 564 (1980). The defendant characterizes the present offenses as crimes of passion, and he maintains that the more appropriate punishment in the circumstances shown here is a term of natural life imprisonment, which, because of the defendant's convictions for the two first degree murders, is the mandatory alternative to the death sentence in this case. See 730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1992). We do not agree.

On the evening of the offenses, the defendant broke into the Caulk residence, obtained a shotgun, and hid in Stacey's closet. The defendant later shot and killed Ruth Caulk and shot Shane Caulk, injuring him. At gunpoint the defendant then ordered Shane and Stacey into the car. The defendant later directed Stacey to drive to a remote area, where he shot Shane in the back of the head. Although the defendant characterizes the present offenses as crimes of passion, we do not agree that they were triggered by or resulted from substantial extenuating circumstances. Stacey had left the defendant months earlier, and even though they continued to see each other intermittently, their relationship was not what it had once been. The defendant's apparent obsession with Stacey and his behavior in this case are more akin to the conduct described as stalking in *People v. McCarthy*, 132 Ill. 2d 331 (1989), than to the sudden, explosive outbursts found in *Leger, Johnson, Buggs*, and *Carlson*. The defendant's conduct here was a continuation of his earlier behavior in his relationship with Stacey, which included violence toward her and her family. At the sentencing hearing, Stacey explained that she continued to see the defendant because she was afraid of what he might do to her or to her mother or brother. Given the record in this case, we decline to disturb the jury's determination that the defendant should be sentenced to death.

## VIII

The defendant next complains of two portions of the prosecution's closing argument at the second stage of the sentencing hearing. Because defense counsel did not object to either of the comments, the defendant also argues that the remarks rose to the level of plain error and, alternatively, that counsel was ineffective for failing to properly preserve the objections.

In summation, the prosecutor stated:

"So, for the Defense to say that his bad childhood is an excuse and he shouldn't get the death penalty for it, I believe is not sufficient reason to preclude imposition of the death penalty."

The defendant now argues that the term "excuse" did not accurately describe the nature and purpose of mitigating evidence under the capital sentencing scheme and could have improperly limited the jury's consideration of evidence in mitigation introduced by the defendant. The defendant correctly notes that evidence may be mitigating even though it does not constitute a defense to the crime for which the defendant was convicted and, further, that evidence of a bad childhood may be mitigating. *Eddings v. Oklahoma*, 455 U.S. 104, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982).

"Nothing requires the prosecution, however, to agree with the defendant that the evidence offered in his behalf is sufficiently mitigating to preclude imposition of the death sentence, or that it is even mitigating at all." *People v. Page*, 155 Ill. 2d 232, 279 (1993). The prosecutor made no attempt to advise the jurors that they could not consider the defendant's evidence in mitigation, and the prosecutor was free to challenge defense counsel's interpretation of that testimony. *People v. Bean*, 137 Ill. 2d 65, 126 (1990). We do not believe that the prosecutor's brief comment here could have prevented the jury from considering this information and assigning it whatever significance the jurors deemed proper.

In his second challenge to the prosecutor's closing argument at the second stage of the sentencing hearing, the defendant cites the following comments, made by the prosecutor in rebuttal:

"The law says, 'Any mitigating factors sufficient to preclude the imposition of death.' And ladies and gentlemen, there are none. But there is the last argument they made. They started off with it; and you know what, ladies

and gentlemen, it basically was this. Don't you kill this defendant. [Defense counsel] said, it is your decision. This decision you make. You hold defendant's life in your hands. Ladies and gentlemen of the jury, I submit to you it was his decision. And if you follow the law, it was John Cole, by his own decisions, by his choices, [who] has sentenced himself to death. You, ladies and gentlemen, are following the law. You are not putting, you wouldn't be sentencing this person to death. He has sentenced himself to death."

The defendant argues that the preceding comments violated *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), by minimizing the importance of the jury's role in the sentencing process. In *Caldwell* the Court found constitutional error in a prosecutor's argument to the jury that a sentence of death would not be final because it would be subject to judicial review.

Considering the prosecutor's remarks in context (*People v. Flores*, 153 Ill. 2d 264, 289 (1992)), we believe that the jury would have understood the argument as a comment on the evidence, rather than as a literal statement of law. *People v. Kokoraleis*, 132 Ill. 2d 235, 286 (1989). Before making the challenged comments, the prosecutor reviewed the parties' evidence in aggravation and mitigation and described the second stage of the sentencing hearing as a process in which the jury was to weigh the conflicting testimony. We note, too, that the jury was accurately instructed on its task during this point of the proceedings.

Given our conclusion that the remarks challenged here were proper, we need not decide whether the prosecutor committed plain error and whether defense counsel was ineffective for failing to object to these comments.

## IX

Finally, the defendant challenges on several grounds

the facial validity of the Illinois death penalty statute (720 ILCS 5/9—1 (West 1992)), contending that the statutory scheme violates the eighth and fourteenth amendments (U.S. Const., amends. VIII, XIV). We have rejected the same arguments in other cases, however, and the defendant fails to offer any reason that would warrant a different result here.

The defendant first argues that the statute places a burden of proof on the defense that effectively precludes the sentencing authority's meaningful consideration of mitigating evidence. Specifically, the defendant complains of the requirement in the statute that the death sentence be imposed unless there is mitigating evidence sufficient to preclude its imposition. See 720 ILCS 5/9—1(g), (h) (West 1992). We have rejected this argument in the past, however, noting that it "rests on a strained interpretation of the statutory language" (*People v. Strickland*, 154 Ill. 2d 489, 539 (1992)), and we see no reason to reach a different conclusion in this case. *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Hampton*, 149 Ill. 2d 71, 116-17 (1992).

Citing *Stringer v. Black*, 503 U.S. 222, 235-36, 117 L. Ed. 2d 367, 382, 112 S. Ct. 1130, 1139 (1992), the defendant next argues that the statute is unconstitutional because it permits the sentencer, in deciding whether to impose the death penalty, to consider "any" aggravating circumstance supported by the evidence. See 720 ILCS 5/9—1(c), (e) (West 1992). We have previously determined that this provision does not render the sentencing scheme vague, and we decline to depart from that holding. See *People v. Taylor*, 166 Ill. 2d 414, 439 (1995); *People v. Young*, 128 Ill. 2d 1, 59 (1989).

As a final matter, the defendant argues that various features of the statute, working in combination, threaten the arbitrary and capricious imposition of the death penalty. We have repeatedly upheld the validity of these

procedures, however, and we do not believe that they are cumulatively or individually unconstitutional. Thus, we have determined that the statute is not invalid for the discretion it affords the prosecutor in deciding whether to request the death penalty in a particular case. *People v. Lewis*, 88 Ill. 2d 129, 146 (1981); *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531, 534-43 (1979). Our cases have also held that the statute is not invalid for failing to require the prosecution to provide the defense with pretrial notice of the intent to seek a sentence of death (*People v. Silagy*, 101 Ill. 2d 147, 161-62 (1984); *People v. Gaines*, 88 Ill. 2d 342, 369 (1981)), or of pretrial notice of the aggravating evidence to be used at a capital sentencing hearing (*People v. King*, 109 Ill. 2d 514, 547 (1986); *People v. Albanese*, 104 Ill. 2d 504, 540 (1984); *Gaines*, 88 Ill. 2d at 369). Comparative proportionality review is not required by the federal Constitution (*Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984)), and the Illinois statute is not invalid for failing to mandate such review (*King*, 109 Ill. 2d at 551; *People v. Stewart*, 104 Ill. 2d 463, 499 (1984); *People v. Kubat*, 94 Ill. 2d 437, 502-04 (1983)). Nor is the statute invalid for not requiring the sentencer to make a written statement of its findings. *King*, 109 Ill. 2d at 550-51; *Stewart*, 104 Ill. 2d at 497; *People v. Brownell*, 79 Ill. 2d 508, 541-44 (1980). Further, the statute is not invalid for failing to impose a burden of persuasion on the State at the aggravation/mitigation stage of the sentencing hearing (*People v. Jones*, 123 Ill. 2d 387, 426 (1988); *People v. Eddmonds*, 101 Ill. 2d 44, 68 (1984); *People v. Free*, 94 Ill. 2d 378, 421 (1983)), and the statute does not invalidly impose on the defense a burden of establishing that a noncapital sentence should be imposed (*People v. Fields*, 135 Ill. 2d 18, 76 (1990); *People v. Orange*, 121 Ill. 2d 364, 390 (1988); *People v. Caballero*, 102 Ill. 2d 23, 49 (1984)). Finally, in cases in which there is no mandatory alterna-

tive to a death sentence, there is no requirement that the sentencing jury be apprised of the precise range of sentences available if the defendant does not receive the death penalty. *People v. Phillips*, 127 Ill. 2d 499, 543 (1989); *People v. Albanese*, 102 Ill. 2d 54, 81 (1984).

Considering the case law upholding these aspects of the statute, we must reject the defendant's argument that in combination they invite its arbitrary and capricious imposition. *People v. Harris*, 164 Ill. 2d 322, 352 (1994); *People v. Page*, 155 Ill. 2d 232, 284-85 (1993); *People v. Pitsonbarger*, 142 Ill. 2d 353, 409 (1990). If the individual aspects of the statute are valid, the whole statute must also be valid. *Phillips*, 127 Ill. 2d at 542-43.

\* \* \*

We vacate the defendant's conviction and sentence for the home invasion count involving the injury to Ruth Caulk. We affirm the judgment of the circuit court of Montgomery County in all other respects. The clerk of this court is directed to enter an order setting Wednesday, September 11, 1996, as the date on which the sentence of death entered in the circuit court of Montgomery County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed in part*
*and vacated in part;*
*death sentence affirmed.*