(No. 79162.—

## THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RAYMOND BURGESS, Appellant.

*Opinion filed April 24, 1997.—Rehearing denied June 2, 1997.*

HARRISON, J., joined by FREEMAN, J., dissenting.

Charles M. Schiedel, Deputy Defender, and Timothy M. Gabrielsen, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and Ted J. Hamer, State's Attorney, of Cambridge (Barbara E. Preiner, Solicitor General, and Arleen C. Anderson and Steven R. Splitt, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE MILLER delivered the opinion of the court:

The defendant, Raymond Burgess, was convicted of first degree murder and aggravated battery of a child following a jury trial in the circuit court of Henry County. At a separate sentencing hearing the same jury found the defendant eligible for the death penalty and further determined that there were no mitigating circumstances sufficient to preclude imposition of that sentence. The defendant was accordingly sentenced to death for his conviction for first degree murder, and he received a sentence of 30 years' imprisonment for the aggravated battery conviction. The defendant's execution has been stayed pending direct review of the case

by this court. Ill. Const. 1970, art. VI, § 4(b); 134 Ill. 2d
Rs. 603, 609(a).

The evidence presented at trial may be stated
briefly. The defendant brought the victim, $3^1/2$-year-old
Matthew Mote, to Illini Hospital, in Silvis, around 5
p.m. on September 24, 1994. Emergency room personnel
attempted to resuscitate the child, but their efforts were
unsuccessful. The attending physician, Dr. Scott Lud-
wig, and the emergency room nurses, Jane Keag and
Kelly Miller, noticed a substantial number of bruises on
the child's body, and law enforcement authorities were
notified because of the nature of the child's injuries.

The defendant agreed to talk to the officers. In his
initial statements, the defendant explained that he and
the child were alone beginning around noon that day,
when the child's mother, Deena Kent, left the residence.
According to the defendant, Matthew soiled his pants
several times. On what turned out to be the last occa-
sion, the defendant cleaned up the victim, bathed him,
and dressed him in clean clothes. The defendant said
that he then left the victim in his bedroom, where he
was playing, while the defendant went to his own
bedroom to watch television. Sometime later, the defen-
dant went to the other bedroom to check on the child.
The defendant said that he found the boy lying under
the box spring of the bed, which had apparently col-
lapsed on him. The defendant told the officers that he
then tried to resuscitate the child but was unsuccessful.
The defendant carried Matthew to the car and picked
up the child's mother at another location. The defen-
dant then drove to the hospital to seek treatment for
the child.

The defendant initially denied hitting or striking
the victim. In response to further questioning, however,
the defendant admitted to officers that he had punched
the victim several times. In a written statement, the de-

fendant explained that as he was cleaning up Matthew, the child threw feces at him, and the defendant told officers that he then punched the child several times in the stomach. The defendant continued to maintain, however, that he left the child in his bedroom to play after the bath, and that sometime later he found the child lying under the box spring. The defendant told the officers that injuries to the victim's rectal area could have been caused by a rubber spatula the defendant used to clean the child. The defendant denied sexually penetrating Matthew.

Police officers searched the defendant's residence, in Green Rock. In the child's bedroom they found the box spring partially off the bed frame, but they noticed toy cars sitting on the railing of the frame, dust on the cars and bed frame, and cobwebs around the frame and the spring. All this suggested to the officers that the box spring had been in that condition for some time. In the bathroom, officers found a rubber spatula, which was clean. The State also introduced testimony from a number of persons who witnessed prior acts of abuse by the defendant toward the victim.

An autopsy was conducted on September 25, 1994, by Dr. Mary Jumbelic at Proctor Hospital, in Peoria. Dr. Jumbelic found evidence of 120 separate injuries to the victim's body. The injuries were primarily bruises, and they were located on the child's face, head, neck, chest, abdomen, genital area, back, buttocks, and arms and legs. One particularly large bruise was found on the child's abdomen. An internal examination revealed that the child had sustained a tear to his liver and to his mesentery. Dr. Jumbelic concluded that the victim died as a result of extensive internal bleeding, in both the cranial and abdominal regions, caused by blunt trauma. Dr. Jumbelic believed that the victim could not have survived more than an hour after incurring the injuries, and that the injuries were not the result of accident.

The autopsy report and photographic evidence in the case were also examined by Dr. Lori Frasier, who testified as an expert in the area of child abuse. Dr. Frasier, a pediatrician, was an assistant professor and director of the child protection and advocacy program at the University of Missouri, Columbia. From her analysis, Dr. Frasier concluded that the victim died as a result of child abuse.

The defense presented testimony from a number of witnesses who described acts of abuse by the child's mother, Deena Kent, toward her son. The defendant also testified at trial. He recounted the events occurring on the day of Matthew's death, and he described his efforts to clean the child after Matthew had soiled his underwear. The defendant said that on the day of the child's death, Matthew had fallen from a stool, had fallen down stairs, had fallen out of a tree, had gotten into a fight with two other boys, and had fallen in the bathtub. The defendant admitted that he had punched the child several times, but he denied causing the victim's death.

In rebuttal, one of the investigating officers testified that the defendant had not said, during questioning, that Matthew had fallen down stairs or from a tree or had been in a fight with other children.

At the close of evidence, the jury found the defendant guilty of two counts of first degree murder and one count of aggravated battery of a child. The matter then proceeded to a capital sentencing hearing. At the first stage of the hearing, the State presented additional evidence showing that the victim's anus was dilated when he was brought to the emergency room and, moreover, that human seminal fluid was present in the anal cavity. The State sought to establish the defendant's eligibility for the death penalty on the basis of two independent statutory aggravating circumstances: commis-

sion of the murder in the course of another felony, in this case, aggravated criminal sexual assault, and the murder of a child in a brutal and heinous manner (720 ILCS 5/9—1(b)(6), (b)(7) (West 1994)). At the conclusion of the first stage of the hearing, the jury found the existence of both statutory aggravating circumstances.

At the second stage of the capital sentencing hearing, the State presented testimony of previous acts of violence committed by the defendant. A woman who had formerly lived with the defendant described two incidents in which the defendant had threatened her with a handgun. One of the woman's two daughters corroborated her mother's account and also testified that the defendant had often spanked her sister. In addition, the parties stipulated that the defendant was convicted of first degree forgery in Georgia in 1987 and received a sentence of three years' probation for that offense.

In mitigation, the defendant presented favorable testimony from a number of persons, including former neighbors of the defendant, a former employer, and the defendant's father. These persons described the defendant as helpful and generous and said that the defendant was kind to children.

At the conclusion of the sentencing hearing, the jury found that there were no mitigating circumstances sufficient to preclude imposition of the death penalty. Accordingly, the trial judge sentenced the defendant to death. The judge later sentenced the defendant to an extended term of 30 years' imprisonment on his conviction for aggravated battery of a child.

I

Following the submission of the defendant's initial brief, this court granted the defendant's motion to stay the normal briefing schedule and to remand the cause to the circuit court of Henry County for a supplementary hearing. According to the order granting the mo-

tion, this was done for the "limited purpose of determining whether defendant ingested psychotropic medication at or near the time of his trial and sentencing." Our order further stated, "The circuit court shall conduct such proceedings as it deems necessary and report its findings to this court within 60 days of this order." The trial judge conducted the hearing in March 1996 and later submitted written findings to us. Before this court, the parties have submitted briefs on the issues raised by the remand proceeding, as well as on issues pertaining to the defendant's trial and sentencing hearing.

The evidence presented at the hearing revealed that Dr. Robert Edwalds, a psychiatrist, prescribed three different drugs for the defendant—doxepin, trazodone, and lorazepam—all of which are classified as psychotropic agents. Dr. Edwalds prescribed these drugs to assist the defendant in sleeping. According to records maintained by the Henry County jail, the defendant received a single dose of doxepin at bedtime on a daily basis from October 21, 1994, to December 10, 1994. The defendant received a single dose of trazodone at bedtime on a daily basis from November 4, 1994, until March 28, 1995. The defendant received a single dose of lorazepam at bedtime on a daily basis from January 13, 1995, until February 22, 1995, and again from March 8, 1995, until March 27, 1995. Jury selection began on March 6, 1995, and the parties gave their opening statements on March 10, 1995. The defendant's capital sentencing hearing concluded on March 21, 1995.

Relying on *People v. Brandon*, 162 Ill. 2d 450 (1994), and its progeny, the defendant argues that he is now entitled to a new trial. The defendant notes that he was receiving psychotropic drugs at the time of his trial and sentencing hearing in this case yet did not then receive a hearing into his fitness, which *Brandon* and subsequent cases have held was required by a statute in force

at the time of the earlier proceedings, section 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West 1994)). The State contends that evidence presented at the hearing on remand clearly demonstrates that the psychotropic drugs ingested by the defendant had no effect on his mental condition during the earlier proceedings.

Dr. Edwalds testified at the hearing on remand that he prescribed three different drugs for the defendant because of the defendant's complaints that the first two were not effective. Dr. Edwalds believed that the drugs would not have had any effect on the defendant's mental condition the following day, given their dosages and the time at night at which they were taken. It appears from the record that Dr. Edwalds had not intended for the different drugs to be taken simultaneously, but that the jailers inadvertently gave the defendant both doxepin and trazodone for a period, and later both trazodone and lorazepam. The defendant was receiving both trazodone and lorazepam at the time of his trial and sentencing hearing. Nonetheless, Dr. Edwalds did not believe that the two drugs, even when taken in combination, would have produced any psychotropic effect on the defendant the following day. Dr. Edwalds noted that the two medications are frequently taken together.

Robert Streight, the jail administrator, testified that he saw the defendant numerous times each day. Streight said that the defendant always seemed alert and normal; Streight did not observe any change in the defendant's demeanor during his period of incarceration. According to Streight, jailers had secretly observed that the defendant would begin shaking when he heard them approach and would cease to shake after they had walked by.

Dr. Linda Gruenberg, a psychiatrist, testified in the defendant's behalf at the hearing on remand. Dr. Gruenberg did not believe that doxepin could have had any

effect on the defendant during trial or sentencing, for the defendant ceased taking it long before trial began. Dr. Gruenberg also did not believe that the defendant would have been affected by lorazepam, which the defendant was taking during the trial and sentencing hearing. Dr. Gruenberg explained that the defendant's bedtime dose of lorazepam, an antianxiety drug, would not have had any significant effect on his mental state the next day. Dr. Gruenberg believed, however, that the defendant could have been affected by the doses he was receiving of trazodone. Dr. Gruenberg said that the drug, an antidepressant that is also prescribed as a sleep aid, was being given to the defendant in amounts that would be sufficient to treat depression. Dr. Edwalds' notes indicated that the defendant was receiving 300 to 450 milligrams of trazodone each night, which Dr. Gruenberg described as a therapeutic dose of that drug for treatment of depression. She believed that a dose sufficient for sleeping would be smaller, ranging from 50 to 150 milligrams.

The defense also presented testimony from the defendant's father, Jess Burgess, who said that he noted a marked change in the defendant's demeanor and behavior after the defendant was in jail. Jess Burgess said that, during visits with his son at the jail, the defendant became hostile and experienced difficulty concentrating. Jess Burgess said that his son was neat and clean shaven before his arrest but became disheveled and unkempt afterwards, and that his son's residence was generally clean.

In rebuttal, the State introduced testimony from the defendant's trial attorney, Raymond Conklin. Over the defendant's objection that Conklin's testimony would violate the attorney-client privilege, Conklin stated that the defendant had been able to assist him in the preparation and presentation of a defense to the charge in

this case. Without relating the contents of any conversations with the defendant, counsel said that the defendant discussed all aspects of the trial with him, including *voir dire*, the selection of defense witnesses, and the choice of questions for prosecution and defense witnesses. Counsel further stated that the defendant always appeared to be alert and coherent.

An additional rebuttal witness, Julianne Redington, testified that she was frequently at the defendant's home during the summer of 1994 in her capacity as a visiting nurse. Redington described the house as filthy and said that the defendant was unkempt.

The trial judge later entered written findings. The judge concluded that the medications given to the defendant in jail each night at bedtime would not have had any psychotropic effect on the defendant the following day. The judge noted that he presided at trial and sentencing and that on all occasions the defendant appeared alert. Relying on his own observations from the earlier proceedings, the judge stated that the defendant "assisted in jury selection and actively participated in his defense, communicated frequently with counsel, wrote notes, and asked questions during recess of counsel and the judge."

The judge further noted that he had not been aware during the earlier proceedings of the defendant's use of the psychotropic medications. The judge stated:

> "The defendant never exhibited any obvious side effects such as drowsiness, lack of memory, inattentiveness or lack of appropriate gait at any time during the proceedings. The defendant never appeared to have any change in mood or demeanor and freely related his physical condition (which included bouts with diarrhea during the first two days of jury selection), to the court. No statements or actions by the defendant indicated any mental disfunctioning or disability, or any issue regarding fitness."

The trial judge concluded that the drugs received by the

defendant had no effect on the defendant's "mental functioning, mood or demeanor in the courtroom."

The State acknowledges that under our decisions in *People v. Brandon*, 162 Ill. 2d 450 (1994), *People v. Gevas*, 166 Ill. 2d 461 (1995), *People v. Birdsall*, 172 Ill. 2d 464 (1996), and *People v. Nitz*, 173 Ill. 2d 151 (1996), this court could simply grant the present defendant a new trial, without regard to his actual condition at the time of the proceedings below, given his ingestion of psychotropic drugs during the trial and sentencing hearing. The State argues, however, that we should not invoke the practice of automatic reversal in this case, in light of the evidence revealed at the special supplemental hearing.

We agree with the State that a rule of automatic reversal is not always appropriate. As this case demonstrates, there will be some circumstances in which it can be said that the use of psychotropic medication did not affect the defendant's mental functioning in such a way that relief would be appropriate. We are aware that we have previously declined to make use of retrospective fitness hearings, noting the difficulty in determining, long after the conclusion of the underlying proceedings, the degree of mental functioning enjoyed then by the defendant. See *People v. Birdsall*, 172 Ill. 2d 464, 476 (1996) (citing *Brandon* and *Gevas*). Nonetheless, we believe that, at least in the present case, there are sufficient reasons to depart from our previous practice of automatic reversal and to make a case-specific inquiry into the psychotropic drugs administered to this particular defendant.

Our decision to consider the possible effects of the drugs on the defendant finds support in the testimony of the defendant's expert witness at the supplemental hearing. Dr. Linda Gruenberg believed that neither doxepin nor lorazepam could have had any effect on the de-

fendant. She noted that the defendant had discontinued taking doxepin months before trial, and that lorazepam, which the defendant took at bedtime during the course of the trial, would have dissipated overnight. As Dr. Gruenberg's testimony demonstrates, we should not automatically assume that every psychotropic drug will inevitably render the person taking it unfit for purposes of trial or sentencing, and we therefore conclude that retrospective hearings are sometimes proper. The evidence in this case, including the prescribing doctor's testimony, the judge's observations, and the defendant's own testimony at trial, compels the conclusion that the defendant was suffering no impairment as a result of his ingestion of psychotropic drugs during the time of his trial and sentencing hearing.

The defendant argues, however, that the scope of the supplemental hearing held in this case exceeded the limited purpose expressed in this court's remand order. At the outset of the hearing, in response to a motion *in limine* filed by the defendant, in which the defendant sought to restrict the evidence that the State could introduce at the hearing, the State argued that a full hearing should be held, and that the proceeding should not be limited to determining simply what drugs defendant was taking when, but also the effects of the drugs prescribed to the defendant. In support of this broad inquiry, the State cited *People v. Kinkead*, 168 Ill. 2d 394, 414-15 (1995), in which this court noted that the record in that case left a number of questions unanswered: "We cannot reliably ascertain from the record when defendant began to take Thorazine, the amount prescribed, the medical reasons it was prescribed for him, or in what manner the drug might have influenced defendant's mental functioning, mood, and demeanor in the courtroom."

Although our order remanding the cause to the trial

court might not have fully anticipated the range of testimony introduced at the hearing, we do not believe that we should ignore the evidence that was presented on remand. Prior to the hearing, the defendant was made aware of the scope of the hearing; at that time, the trial judge denied a motion *in limine* by the defense that sought to preclude the State from presenting testimony on the possible effects of the drugs prescribed in this case. The defendant was able to participate fully in the ensuing proceedings and, further, was granted funds for the purpose of retaining his own expert witness, Dr. Gruenberg, to provide testimony regarding the effects of the drugs involved here.

The defendant raises the additional contention that the testimony given by his trial counsel at the hearing on remand violated the attorney-client privilege. The defendant maintains that the privilege was not waived by his raising the fitness issue. See *People v. Knuckles*, 165 Ill. 2d 125 (1995). We agree with the defendant that at least some parts of trial counsel's testimony at the remand hearing were given, over trial counsel's own objection, in violation of the defendant's attorney-client privilege. Although counsel, relying on his observations of his client, could freely testify to the defendant's demeanor (*People v. Williams*, 97 Ill. 2d 252, 293-95 (1983)), counsel could not base his assessment of the defendant's mental condition on privileged communications made by the defendant in the course of the attorney-client relationship. 81 Am. Jur. 2d *Witnesses* §§ 401, 402 (1992). We have accordingly limited our consideration of counsel's testimony to those portions that do not violate the attorney-client privilege; we note that the trial judge's findings do not appear to rely on that testimony.

In light of our decision here, we need not consider the State's alternative argument that a recently amended version of the psychotropic drug statute, sec-

tion 104—21(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—21(a) (West Supp. 1995)) controls the present appeal and that the defendant is not entitled to any relief under the new provision. *Cf. People v. Birdsall*, 172 Ill. 2d 464, 475 n.1 (1996) (summarily stating that amended statute not applicable in that case).

In a separate argument, the defendant contends that he was unfit to stand trial because he was suffering from stomach cramps and diarrhea during jury selection. The defendant notes his comment to the judge during *voir dire* that he was having difficulty concentrating on the case. In addition, as further evidence of his inability to assist his trial attorney, the defendant notes that questioning of prospective jurors continued during several of his many trips to the restroom.

The defendant failed to raise this issue at trial. In any event, the evidence in the record does not present a *bona fide* doubt of the defendant's fitness, necessary to trigger his right to a fitness hearing under section 104—11 of the Code of Criminal Procedure of 1963 (725 ILCS 5/104—11 (West 1994)). In addition, a review of the transcript reveals that the defendant expressly chose to go forward with the proceedings, and did not want to delay them, despite his complaint about not being able to concentrate. On only three occasions did any *voir dire* examination occur while the defendant was absent. At those times, the trial judge did not immediately realize that the defendant had absented himself from the proceedings; once the judge became aware of the defendant's absence, the trial judge ceased questioning the prospective jurors and waited for the defendant to return. Upon the defendant's return, the trial judge repeated to the defendant what had occurred in his absence. We find nothing in this case to suggest that the defendant was unfit for trial, was unable to understand the process of selecting a jury, or was otherwise unable to assist his attorney.

The defendant next argues that the trial judge abused his discretion in allowing the State to introduce, over a defense objection, evidence of prior acts of abuse committed by the defendant against the victim.

Evidence of prior acts of misconduct is admissible if relevant for some purpose other than to show a propensity for crime, and if the probative value of the evidence outweighs its prejudicial effect. See *People v. Illgen*, 145 Ill. 2d 353, 364-65 (1991); *People v. McKibbins*, 96 Ill. 2d 176, 182 (1983). A trial judge's decision allowing the introduction of evidence of this nature will be upheld on review unless the ruling represents an abuse of discretion. *People v. Phillips*, 127 Ill. 2d 499, 522 (1989).

As an initial matter, we must reject the defendant's argument that this evidence was not sufficiently probative because, the defendant says, none of the witnesses actually saw the defendant commit any act of abuse toward the victim. We note that the defendant did not make this objection in the proceedings below in opposition to the introduction of this testimony. In any event, we do not agree with the defendant's characterization of the evidence as lacking probative value or of the defendant's conduct as nonabusive. One witness, Mary Martin, testified that in late July 1994 she saw the defendant grab a dog leash, fold it over, and walk into the victim's bedroom. Martin then heard the sound of something being hit and heard the victim cry out. Martin heard 5 to 10 strikes in all. Moments later, the defendant left the child's bedroom, slammed the leash on a table, and told the child's mother to use the leash in the future. Martin afterwards saw fresh welts from the top of the victim's back down to his legs.

Another witness, Margaret Miller, testified that in July or August 1994 she saw the defendant spank the victim on the bottom, leaving signs of his handprints on the child's skin. This witness also saw the defendant

push the victim into a corner, causing him to hit the wall. A neighbor, Debra Donovan, testified that sometime after the victim and his mother moved in with the defendant in June 1994, she saw the defendant kick Matthew, causing the child's legs to fly off the ground. Allen Williamson, who lived in the defendant's residence for one or two months that summer, said that the defendant would spank the child four or five times a day. Williamson stated that the defendant generally took Matthew to another room for that purpose, but the witness said that he could hear the child crying.

We cannot say that the trial judge in the present case abused his discretion in allowing the prosecution to introduce the evidence of the defendant's prior acts of abuse. The defense theory at trial was that the three-year-old victim sustained a series of accidental injuries on the day of his death. Although the defendant admitted striking the child several times during that afternoon, he denied that those blows were deadly, and he claimed that the fatal injury was caused by the accidental collapse of a box spring on the child. To counter the defense theory, the prosecution appropriately sought to present evidence of prior acts of abuse committed by the defendant against the victim, to show the presence of intent and the absence of accident. See *People v. Oaks*, 169 Ill. 2d 409, 453-55 (1996); *People v. Lucas*, 132 Ill. 2d 399, 429 (1989); *People v. Platter*, 89 Ill. App. 3d 803, 820-22 (1980). Although the earlier instances of abuse were not in all respects like the fatal injuries to the child's abdomen and head, only general similarities between the different acts are necessary when such evidence is offered simply to show an absence of an innocent frame of mind, or the presence of criminal intent. *Oaks*, 169 Ill. 2d at 454; *Illgen*, 145 Ill. 2d at 373.

In further opposition to this evidence, the defendant notes that the victim's mother, Deena Kent, was also

abusive toward the victim. We do not believe, however, that evidence of Kent's misconduct alters the admissibility of testimony detailing the defendant's own prior acts of abuse. We conclude that the testimony of these witnesses was properly admitted.

The defendant, in his last contention relating to the guilt phase of the proceedings, argues that error occurred in the introduction of testimony from two expert witnesses that the numerous bruises incurred by the victim in this case were not consistent with accidental injuries. Defense counsel made no objection to these portions of the testimony of Dr. Jumbelic and Dr. Frasier, nor did counsel raise the issue in the defendant's post-judgment motion. To surmount the effects of the waiver, the defendant also argues that the admission of the testimony was plain error and, further, that defense counsel was ineffective for failing to object to it.

This court's recent opinion in *People v. Oaks*, 169 Ill. 2d 409, 460-62 (1996), is dispositive of the defendant's challenge to this evidence. In *Oaks*, we found no error in a physician's testimony that a child's death was not accidentally caused. The witness at issue in *Oaks* was, incidentally, one of the witnesses in this case whose testimony the present defendant challenges. In sustaining the opinion testimony offered by Dr. Frasier in that case, the *Oaks* court explained:

> "This court has stated that, generally, an individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will aid the trier of fact in reaching its conclusion. (*People v. Enis* (1990), 139 Ill. 2d 264, 288; *People v. Jordan* (1984), 103 Ill. 2d 192, 208.) In this case, we conclude that the lay jury needed the expert testimony of Dr. Frasier to determine whether, based on their severity, the victim's injuries were caused intentionally or accidentally." *Oaks*, 169 Ill. 2d at 461.

As in *Oaks*, one of the issues in the present case was

whether the victim's injuries occurred accidentally, as the defendant claimed. Dr. Jumbelic and Dr. Frasier were qualified as experts on this subject, and the matter on which they testified was outside the jury's range of competence. See *Oaks*, 169 Ill. 2d at 461. We find no error in the introduction of their testimony.

Finally, we decline the defendant's invitation to overrule *Oaks*. Contrary to the defendant's contention, there is no inconsistency between *Oaks* and our cases barring the introduction, at a death penalty hearing, of expert testimony on the deterrent value of capital punishment. The death penalty is an authorized sentence in Illinois, and testimony regarding its efficacy would not be relevant to the decision made by the sentencer. *People v. Williams*, 97 Ill. 2d 252, 300-01 (1983).

## II

The defendant next raises a series of challenges to the capital sentencing hearing conducted in this case. The defendant first argues that his trial attorney rendered ineffective assistance when he in essence conceded his client's eligibility for the death penalty under one of the two statutory aggravating circumstances alleged by the States.

At the first stage of the bifurcated sentencing hearing, the State sought to qualify the defendant for the death penalty under two separate statutory aggravating circumstances: murder in the course of a specified felony, in this case, criminal sexual assault (720 ILCS 5/9—1(b)(6) (West 1994)), and murder of a child in a brutal and heinous manner (720 ILCS 5/9—1(b)(7) (West 1994)).

The defendant complains that his trial attorney challenged only the application of section 9—1(b)(6) of the Criminal Code of 1961, and did not contest, and even conceded, the defendant's eligibility under section 9—1(b)(7). As evidence of counsel's ineffectiveness, the defendant cites a number of comments made by trial

counsel in opening statement and closing argument at the first stage of the sentencing hearing. In opening statement counsel told the jury that the defendant "may well qualify for the death penalty" and that he "may well be eligible" for that sentence. Later, in closing argument, defense counsel stated:

"If you want to, or as you consider all the evidence, I'll tell you that if you so desire there's enough evidence that you can find the murder was, or the death was, resulted from brutal and heinous behavior, but I want to talk to you about the other [statutory aggravating circumstance] for a while."

Defense counsel then challenged the prosecution's evidence that a sexual assault had occurred.

A claim of ineffective assistance of counsel is generally measured against the two-part standard announced by the United States Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). To succeed on a claim of ineffective assistance under *Strickland*, a defendant must establish both that counsel's performance was deficient and that the deficiency proved to be prejudicial. *Strickland*, 466 U.S. at 687, 80 L. Ed. 2d at 693, 104 S. Ct. at 2064. Judicial scrutiny of counsel's performance is highly deferential under *Strickland*, and a court considering an ineffectiveness claim "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689, 80 L. Ed. 2d at 694, 104 S. Ct. at 2065. To establish prejudice resulting from an asserted deficiency in counsel's performance, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

Only in a few instances will prejudice be presumed, making a separate inquiry into prejudice unnecessary. See *United States v. Cronic*, 466 U.S. 648, 80 L. Ed. 2d 657, 104 S. Ct. 2039 (1984). In *Cronic* the Supreme Court noted that when "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable." *Cronic*, 466 U.S. at 659, 80 L. Ed. 2d at 668, 104 S. Ct. at 2047. In those circumstances prejudice to a defendant may be presumed. *Strickland*, 466 U.S. at 692, 80 L. Ed. 2d at 696, 104 S. Ct. at 2067. The defendant believes that this is such a case, citing *People v. Hattery*, 109 Ill. 2d 449 (1985), in which this court presumed that the defendant was prejudiced by trial counsel's representation. In *Hattery*, counsel conceded, in opening statement, his client's guilt to murder charges, introduced no evidence at trial, and failed to make a closing argument to the jury. The present defendant argues that a presumption of prejudice is necessary in this case, noting that there is no possible strategic value in being found eligible under one, rather than two, aggravating circumstances.

We believe that the present case is more similar to *People v. Rissley*, 165 Ill. 2d 364 (1995), than it is to *Hattery*. Defense counsel in *Rissley* conceded the defendant's eligibility for the death penalty under section 9—1(b)(6) but sought to challenge the applicability of section 9—1(b)(7), the reverse of the situation here. This court found that counsel's conduct did not amount to plain error and noted that "defense counsel's apparent concession regarding eligibility under section 9—1(b)(6) came in the context of mounting a more pointed challenge against eligibility under section 9—1(b)(7)." *Rissley*, 165 Ill. 2d at 397.

At trial, counsel had challenged the prosecution's

theory of the case, and the defendant had provided the jury with his own account of the events leading up to the victim's death. The jury rejected the defense contentions, however. When the sentencing hearing convened, defense counsel apparently believed that he could possibly defeat one of the aggravating circumstances but not the other, and that he would lose credibility with the jury if he attempted to argue that the 120 injuries sustained by the victim were not the result of brutal and heinous behavior. Notwithstanding the comments cited by the defendant, counsel's closing argument at the first stage of the hearing reminded the jury of the State's evidentiary burden in establishing either aggravating circumstance, and defense counsel argued further that there was no presumption that the defendant was eligible for the death penalty.

For these reasons, we believe that *Hattery* is inapplicable here. See *People v. Johnson*, 128 Ill. 2d 253, 269-71 (1989). The present defendant, if he is to prevail on his claim of ineffective assistance, must therefore establish both a deficiency in counsel's performance and prejudice resulting from the asserted deficiency. Failure to establish either proposition will prove fatal to the claim. *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069; *People v. Harris*, 164 Ill. 2d 322, 349 (1994). In applying the *Strickland* standard, a reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies." *Strickland*, 466 U.S. at 697, 80 L. Ed. 2d at 699, 104 S. Ct. at 2069.

We are unable to conclude that counsel's alleged deficiency had any effect on the outcome of the first stage of the sentencing hearing. Under the prejudice inquiry, "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a

criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691, 80 L. Ed. 2d at 696, 104 S. Ct. at 2066. The evidence of the defendant's eligibility under section 9—1(b)(7) was overwhelming, and we do not believe that there is a reasonable probability that the result of the first stage of the sentencing hearing would have been different if counsel had challenged the defendant's qualification for the death penalty under section 9—1(b)(7). That provision renders a capital defendant eligible for the death penalty if "the murdered individual was under 12 years of age and the death resulted from exceptionally brutal or heinous behavior indicative of wanton cruelty." 720 ILCS 5/9—1(b)(7) (West 1994). The jury had already found the defendant guilty of the first degree murder of the child. Both Dr. Mary Jumbelic and Dr. Lori Frasier had testified that the victim's numerous injuries were not incurred accidentally, and the jury had rejected the defendant's claim that the child died as a result of an accident. Dr. Frasier had further testified that the severe injuries sustained by the victim were comparable to those that a child would incur if he were to fall 20 feet onto a concrete surface, or were to be thrown from an automobile in a collision. On this record, we conclude that the remarks of counsel challenged here had no effect on the jury's decision to find the defendant eligible for the death penalty under section 9—1(b)(7).

In an additional contention related to the brutal and heinous aggravating circumstance found in section 9—1(b)(7), the defendant briefly argues that trial counsel was ineffective for failing to make any challenge to the constitutionality of that provision. The defendant asserts that the terms of the statute are unconstitutionally vague. See *Maynard v. Cartwright*, 486 U.S. 356, 100 L. Ed. 2d 372, 108 S. Ct. 1853 (1988).

The present argument assumes, of course, that the

provision is constitutionally infirm and therefore susceptible to challenge. This court has previously determined that the aggravating circumstance set forth in section 9—1(b)(7) passes constitutional muster, however, when it is coupled with a limiting construction, and the defendant makes no challenge to the limiting construction provided to the sentencing jury in the present case.

A limiting construction may save a statutory aggravating circumstance that must otherwise be considered unconstitutionally vague under the eighth amendment. See *Arave v. Creech*, 507 U.S. 463, 471, 123 L. Ed. 2d 188, 198, 113 S. Ct. 1534, 1541 (1993) ("Unlike the Court of Appeals, we do not believe it is necessary to decide whether the statutory phrase 'utter disregard for human life' itself passes constitutional muster. The Idaho Supreme Court has adopted a limiting construction, and we believe that construction meets constitutional requirements"); *Walton v. Arizona*, 497 U.S. 639, 654, 111 L. Ed. 2d 511, 529, 110 S. Ct. 3047, 3057 (1990) ("In this case there is no serious argument that Arizona's 'especially heinous, cruel or depraved' aggravating factor is not facially vague. But the Arizona Supreme Court has sought to give substance to the operative terms, and we find that its construction meets constitutional requirements").

In *People v. Lucas*, 132 Ill. 2d 399, 444 (1989), the court agreed with the defendant's argument that section 9—1(b)(7) "was unconstitutionally applied in his case because his conduct did not rise to the level of 'exceptionally brutal or heinous' behavior." In resolving that question, the court looked to case law and dictionary definitions of the relevant terms and noted that "[c]ases in which this court has found brutal or heinous behavior to be present have generally involved prolonged pain, torture or premeditation." *Lucas*, 132 Ill.

2d at 445. The court found that the defendant's actions did not meet any of those criteria, and the court thus concluded that the defendant was not eligible for the death penalty on the basis of the "exceptionally brutal" aggravating circumstance contained in section 9—1(b)(7).

Later, in *People v. Tye*, 141 Ill. 2d 1 (1990), and in *People v. Fair*, 159 Ill. 2d 51 (1994), this court undertook a similar analysis, measuring the actions of the defendants in those cases against the definitions that had been formulated in *Lucas.* In both *Tye* and *Fair* the court concluded that the defendants had acted with the requisite brutality and upheld the determinations that the defendants were eligible for the death penalty under section 9—1(b)(7).

In the present case, the trial judge specifically instructed the jury on the meanings of the terms used in section 9—1(b)(7). See Illinois Pattern Jury Instructions, Criminal, No. 7B.07 (3d ed. Supp. 1996). The defendant has not challenged the definitions contained in the pattern instructions and given to the jurors in this case. Because the defendant has not established the predicate for an ineffective-assistance claim, we need not consider this issue further.

In his next series of arguments, the defendant raises several challenges to the prosecutor's closing argument at the second stage of the capital sentencing hearing. The defendant first complains of the following comment, made by the prosecutor in summation:

"This defendant referred to Matthew at one time during his testimony as the kid that died. He's never said he's sorry. You heard his father testify, and I asked him if he ever said he's sorry. He's never said that. He's cold. He's evil. He's devoid of mercy, compassion. He's devoid of human values."

Defense counsel did not object to the preceding remarks or raise the issue in the defendant's post-judgment motion. The defendant now contends that the prosecutor's

comments violated his fifth amendment privilege against compelled self-incrimination. Acknowledging counsel's procedural default of the issue, the defendant asks that we consider this claim under the rubric of either plain error or ineffective assistance of counsel.

We do not agree with the defendant that the remarks made in this case were an impermissible commentary on the defendant's failure to incriminate himself. "This court has consistently held that a convicted defendant's remorse or the absence of it is a proper subject for consideration at sentencing." *People v. Barrow*, 133 Ill. 2d 226, 281 (1989). See also *People v. Erickson*, 117 Ill. 2d 271, 302 (1987); *People v. Ward*, 113 Ill. 2d 516, 527-32 (1986); *People v. Neal*, 111 Ill. 2d 180, 196 (1985); *People v. Albanese*, 102 Ill. 2d 54, 80-81 (1984). The challenged remarks here derived not from the defendant's failure or refusal to incriminate himself, but from the manner in which the defendant referred to the child victim in this case in his testimony, when he offhandedly described Matthew Mote as "the kid that died," and from the testimony of the defendant's father, who said that the defendant had not expressed remorse for the child's death. In the present case, the prosecutor did not specifically refer to the defendant's failure to incriminate himself, or seek to cast the defendant's assertion of that right in an unfavorable light. Rather, the prosecutor's statements should be construed simply as a comment on the defendant's apparent lack of remorse for the child's death. These remarks were clearly related to the defendant's own testimony at trial and to the testimony of the defendant's father at the sentencing hearing.

In sum, we conclude that the challenged comments were based on the evidence presented in this case and were not impermissible remarks on the defendant's failure to incriminate himself. Because we have found that the prosecutor's argument was proper, we need not

consider whether plain error occurred or whether defense counsel was ineffective for failing to preserve an objection to the remarks.

The defendant next complains of two further portions of the prosecutor's closing argument at the second stage of the sentencing hearing. The defendant contends that these comments improperly reduced the jury's sense of responsibility for the decision it was being asked to make. In summation, the prosecutor stated:

"I didn't choose to be here. And you didn't choose to be here. There's only one person that's responsible for us being here today. He wrote the book. He wrote the story. He wrote all the plays and he alone is responsible. Ray Burgess wrote this story, the story that's brought us together to do what we have to do."

Later, in rebuttal, the prosecutor stated:

"I made the decision in this case to go for the death penalty on behalf of the People of the State of Illinois. But there's only one person and one person only that has to shoulder any blame for anything that happened here today or anything that's going to happen. And that's Ray Burgess. He's the only person that needs to take responsibility for what he did and for what is going to happen to him."

The defendant contends that the preceding comments violated *Caldwell v. Mississippi*, 472 U.S. 320, 86 L. Ed. 2d 231, 105 S. Ct. 2633 (1985), by minimizing the jury's role in the capital sentencing process. In *Caldwell* the Supreme Court found constitutional error in a prosecutor's argument, to which defense objections were overruled, that a decision by the jury to impose the death penalty would not be final because it would be subject to judicial review. In the present case, defense counsel did not object to these portions of the prosecutor's closing argument or raise the issue in the post-judgment motion. The defendant therefore contends that the prosecutor's remarks amounted to plain error and, further, that trial counsel was ineffective for failing to preserve this issue.

Regarding the specific comments challenged here, the defendant contends that he could not have been literally responsible for convening the sentencing hearing because only the State may request one. Further, the defendant believes that the comment on the prosecutor's decision to seek the death penalty impermissibly evinces a shared sense of responsibility for that sentence. Finally, the defendant contends that the references to his responsibility for the hearing would have improperly diminished the jury's sense of its own duty.

The parties are allowed wide latitude in closing argument, and comments of counsel must be evaluated in the context in which they were made. See *People v. Flores*, 153 Ill. 2d 264, 289 (1992); *People v. Fields*, 135 Ill. 2d 18, 62, 64 (1990). We do not believe that the remarks challenged here would have improperly affected the jury's understanding of its unique part in the capital sentencing process. Considering the prosecutor's remarks in context, we believe that the jurors would have understood them simply as a comment on the evidence in the case and the chain of circumstances that led to the sentencing hearing, and not as a literal description of the law governing the jury's role or determination. See *People v. Cole*, 172 Ill. 2d 85, 112-13 (1996); *People v. Page*, 155 Ill. 2d 232, 280-82 (1993). In the course of his remarks, the prosecutor reviewed the evidence in aggravation and mitigation and spoke of the part played by the jury in the sentencing process. The prosecutor noted on several occasions that the decision the jury was required to make was a difficult one. At the conclusion of the hearing, the trial judge correctly instructed the jury on its responsibilities, as well as on the purpose of closing argument. We do not believe that the jury would have interpreted the prosecutor's comments as contradicting those instructions, or that the jury was otherwise misled regarding its true role in the

sentencing process. See *People v. Pasch*, 152 Ill. 2d 133, 204-06 (1992). Accordingly, we need not determine whether plain error occurred, or whether defense counsel was ineffective for failing to object to the prosecutor's remarks.

The defendant alleges one further instance of misconduct by the State during closing argument at the second stage of the sentencing hearing. The defendant cites the following comments by the prosecutor in summation:

> "[Matthew Mote] didn't have a choice whether he was going to live or die because he had no control over the situation. The only person who had a choice on September 24 was Ray Burgess and he made it. He's had all his rights guaranteed. He had a right to trial by jury. He's got a right to an eligibility hearing. He's got a right to a sentencing hearing, got a right to be represented by an attorney and have his day in court."

The prosecutor went on to say that justice would be served in this case if the jury returned a sentence of death. The defendant argues that the preceding comments denied him due process and violated each of the separate rights enumerated by the prosecutor. In this regard, the defendant correctly notes that an offender may not receive a more severe punishment simply because he has chosen to invoke his constitutional rights. See *United States v. Jackson*, 390 U.S. 570, 20 L. Ed. 2d 138, 88 S. Ct. 1209 (1968).

The jury was already aware, of course, that the defendant possessed the constitutional and statutory rights listed by the prosecutor. The defendant construes the preceding comments, however, as an attempt to inflame the jury by contrasting the defendant, and the rights he enjoyed, with the young victim, who did not have the benefit of those same procedural safeguards before his death. Assuming that this was the prosecutor's purpose and that the comments were improper, we do not believe

that the present defendant may prevail on a claim of either plain error or ineffective assistance of counsel. The plain error doctrine represents a limited exception to the waiver rule. Contrary to the defendant's contention, we do not believe that the question rises to the level of plain error. See 134 Ill. 2d R. 615(a) (On review, "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the trial court"). The plain-error doctrine is appropriately invoked when the evidence in the case is closely balanced, or when the alleged error is so fundamental that it denies the defendant a fair proceeding. *People v. Banks*, 161 Ill. 2d 119, 143 (1994); *People v. Childress*, 158 Ill. 2d 275, 300 (1994); *People v. Bean*, 137 Ill. 2d 65, 80 (1990). We do not believe that either element has been satisfied here. The aggravating evidence in this case was overwhelming, consisting chiefly of the brutal circumstances of the defendant's crimes. The comment at issue was isolated, and the prosecutor did not emphasize the point. The claimed error was not of such magnitude that it could have deprived the defendant of a fair sentencing hearing.

We must also reject the defendant's alternative argument that trial counsel was ineffective for failing to object to the comments challenged here. Even if counsel was deficient, the defendant cannot establish prejudice from the alleged deficiency. As we have noted, this portion of the prosecutor's closing argument was brief and unrepeated, and we do not believe that it had any effect on the jury's consideration of the aggravating and mitigating evidence in the case, or on the jury's ultimate determination to impose the death sentence.

### III

As a final matter, the defendant raises a number of challenges to the constitutionality of the Illinois death penalty statute, section 9—1 of the Criminal Code of

1961 (720 ILCS 5/9—1 (West 1994)). This court has repeatedly rejected the same arguments in the past, and the defendant provides no grounds that would warrant our reaching a different result in this case.

The defendant first takes issue with the requirement in the statute that the death sentence be imposed unless there exists mitigating evidence sufficient to preclude it. 720 ILCS 5/9—1(g), (h) (West 1994). The defendant believes that this criterion prevents the sentencing authority from giving full effect to mitigating evidence introduced in a capital defendant's behalf. We have previously rejected the same contention, finding that it "rests on a strained interpretation of the statutory language" (*People v. Strickland*, 154 Ill. 2d 489, 539 (1992)), and we adhere to that holding. See *People v. Page*, 155 Ill. 2d 232, 283 (1993); *People v. Hampton*, 149 Ill. 2d 71, 116-17 (1992).

The defendant also argues that various aspects of the death penalty statute invite the arbitrary and capricious imposition of that sentence. We have consistently affirmed the validity of these procedures, however, and thus have no reason to find them cumulatively unconstitutional.

Our cases have held that the statute is not invalid for the discretion allowed to the prosecutor in deciding whether to seek a sentence of death in a particular case. *People v. Lewis*, 88 Ill. 2d 129, 146 (1981); *People ex rel. Carey v. Cousins*, 77 Ill. 2d 531, 534-43 (1979). We have also held that the statute is not invalid for failing to require the prosecution to provide the defense with pretrial notice of its intent to seek a sentence of death (*People v. Silagy*, 101 Ill. 2d 147, 161-62 (1984); *People v. Gaines*, 88 Ill. 2d 342, 369 (1981)) or of pretrial notice of the aggravating evidence to be used at a capital sentencing hearing (*People v. King*, 109 Ill. 2d 514, 547 (1986); *People v. Albanese*, 104 Ill. 2d 504, 540 (1984); *Gaines*, 88

Ill. 2d at 369). Nor is the statute invalid for not requiring the sentencer to provide a written memorial of its findings in the case. *King*, 109 Ill. 2d at 550-51; *People v. Stewart*, 104 Ill. 2d 463, 499 (1984); *People v. Brownell*, 79 Ill. 2d 508, 541-44 (1980). The death penalty statute is not invalid for failing to impose a burden of persuasion on the prosecution at the second stage of the hearing (*People v. Jones*, 123 Ill. 2d 387, 426 (1988); *People v. Eddmonds*, 101 Ill. 2d 44, 68 (1984); *People v. Free*, 94 Ill. 2d 378, 421 (1983)), and the statute does not invalidly impose on the defense a burden of establishing that a sentence other than death should be imposed (*People v. Fields*, 135 Ill. 2d 18, 76 (1990); *People v. Orange*, 121 Ill. 2d 364, 390 (1988); *People v. Caballero*, 102 Ill. 2d 23, 49 (1984)). In those instances in which there is no mandatory alternative to a sentence of death, there is no requirement that the sentencing jury be informed of the various other sentences that may be imposed. *People v. Phillips*, 127 Ill. 2d 499, 543 (1989); *People v. Albanese*, 102 Ill. 2d 54, 81 (1984). Comparative proportionality review is not required by the federal constitution (*Pulley v. Harris*, 465 U.S. 37, 79 L. Ed. 2d 29, 104 S. Ct. 871 (1984)), and the Illinois statute is not invalid for failing to compel such review (*King*, 109 Ill. 2d at 551; *People v. Stewart*, 104 Ill. 2d 463, 499 (1984); *People v. Kubat*, 94 Ill. 2d 437, 502-04 (1983)). Given the extensive precedent sustaining these aspects of the statutory scheme, we reject the defendant's argument that, in combination, these features of the statute threaten its arbitrary and capricious imposition. *People v. Harris*, 164 Ill. 2d 322, 352 (1994); *People v. Pitsonbarger*, 142 Ill. 2d 353, 409 (1990).

* * *

For the reasons stated, the judgment of the circuit court of Henry County is affirmed. The clerk of this court is directed to enter an order setting Tuesday,

September 16, 1997, as the date on which the sentence of death entered in the circuit court of Henry County is to be carried out. The defendant shall be executed in the manner provided by law (725 ILCS 5/119—5 (West 1994)). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Stateville Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

JUSTICE HARRISON, dissenting:

Once the trial court determined on remand that defendant was taking psychotropic drugs at the time of his trial and sentencing, no further inquiry was authorized or appropriate. The rule is clear and the remedy is automatic. Defendant is entitled to a new trial under *People v. Brandon*, 162 Ill. 2d 450 (1994), and the cases we have decided in accordance with *Brandon*.

The trial court's decision to take additional evidence beyond the scope of our remand instructions can only be understood as evincing dissatisfaction by the trial court with the *Brandon* rule. The court was obviously searching for a way to circumvent our decisions, but the decisions of the supreme court are not optional, nor are our orders. Where we issue clear and unambiguous directions to a circuit court, those directions must be strictly followed. Any action taken by the circuit court beyond those directions is outside the scope of its authority and void for lack of jurisdiction. *People ex rel. Daley v. Schreier*, 92 Ill. 2d 271, 276-77 (1982).

By considering the additional evidence taken by the trial court here, my colleagues have ignored this principle completely. In so doing, they may have dealt a serious blow to our authority as an institution. Our power depends on obedience to our decisions, but if circuit courts can depart from those decisions whenever

a majority on this court considers it expedient in a particular case, we will quickly find our power gone. Lower courts will have no incentive to do what we have instructed them to do because they know that, depending on the passing fancy of this court, they are very likely to get away with it.

In ruling as it does, the majority makes no effort at all to distinguish this case from *Brandon* and its progeny. It tells us that there are "sufficient reasons" to depart from past precedent "at least in the present case" (176 Ill. 2d at 303) but nowhere does it give its reasons or explain what it is about this case that makes it different. The majority simply proceeds to make an after-the-fact assessment of defendant's fitness at the time of trial, the very practice this court has repeatedly and consistently rejected. *People v. Gevas*, 166 Ill. 2d 461, 471 (1995); *People v. Birdsall*, 172 Ill. 2d 464, 480 (1996).

The only conclusion one can reasonably draw from all of this is that the *Brandon* line of cases, as recent as it is, has been suddenly and inexplicably overruled. Whatever one thinks of the wisdom of *Brandon*, such action is improper. Once a principle of law has been established by the court, the doctrine of *stare decisis* dictates that it should not be discarded simply because some members of the court disagree or have changed their minds. As this court explained in *Chicago Bar Ass'n v. Illinois State Board of Elections*, 161 Ill. 2d 502, 510 (1994):

> "The doctrine of *stare decisis* is the means by which courts ensure that the law will not merely change erratically, but will develop in a principled and intelligible fashion. *Stare decisis* permits society to presume that fundamental principles are established in the law rather than in the proclivities of individuals."

The majority's decision today is directly contrary to these principles. Indeed, we have no *stare decisis* under the majority's opinion in this case. The doctrine is dead.

If there is no *stare decisis* and if lower courts are now free to disregard our orders, it is difficult for me to see what practical function we serve as a court of review. One thing is sure though. Illinois jurisprudence has seen brighter moments.

JUSTICE FREEMAN joins in this dissent.