2022 IL App (1st) 192506-U

SIXTH DIVISION
June 3, 2022

No. 1-19-2506

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT

| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
|---|---|---|
| | ) | Circuit Court of |
| Respondent-Appellee, | ) | Cook County |
| | ) | |
| v. | ) | No. 13 CR 15769 |
| | ) | |
| DYVELL MALLET, | ) | Honorable |
| | ) | Mary Margaret Brosnahan, |
| Petitioner-Appellant. | ) | Judge Presiding. |

JUSTICE MIKVA delivered the judgment of the court.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment.

**O R D E R**

¶ 1   *Held*:   Defendant's convictions for first degree murder and attempted murder are reversed where the trial court erred in denying a motion to suppress an inculpatory statement to police after interrogators failed to honor defendant's right to remain silent. As the admission of this statement was not harmless error, the case is remanded for a new trial where the statement may not be used.

¶ 2   After a jury trial, Dyvell Mallet was convicted of one count of first degree murder and three counts of attempted murder. He was sentenced to 43 years in prison. He now appeals, arguing that (1) the trial court erred in denying a motion to suppress an inculpatory statement, both because his interrogators failed to honor his right to remain silent after he had invoked it and because his

statement was not made voluntarily; (2) the trial court erred in finding that a videorecording of the statement intentionally altered by the State prior to trial was admissible; (3) his three convictions for attempted murder should be vacated because the State failed to prove the requisite mental state for those offenses beyond a reasonable doubt; and (4) his 43-year sentence should be vacated because it is both excessive and was imposed without proper consideration of each of the mandatory statutory mitigating factors for the sentencing of juveniles enumerated in section 5-4.5-105 of the Unified Code of Corrections (730 ILCS 5/5-4.5-105(a) (West 2020)). For the following reasons, we reverse and remand this case for a new trial.

¶ 3                                     I. BACKGROUND

¶ 4                                     A. The Shooting

¶ 5     On July 8, 2013, a group of individuals gathered near the corner of Lawndale Avenue and Ohio Street in Chicago. The group included 15-year-old Ed Cooper, Ed's brother Jerome Wordlaw, their cousin Spencer Jackson, and an acquaintance named Paris Watson. At around 5 p.m., a young man, who witnesses would later describe as an African-American male with a slim build and dreadlocks, approached the group. Brandishing what appeared to be a revolver, the young man fired his weapon multiple times in the group's direction. Everyone took off running through a nearby vacant lot. Although Mr. Wordlaw, Mr. Jackson, and Mr. Watson emerged from the gunfire unscathed, Ed Cooper was hit by one of the rounds and subsequently died from his injuries.

¶ 6     On the afternoon of July 16, 2013, the defendant in this case, Dyvell Mallet, was arrested in connection with the shooting. Dyvell, who was 16 years old at the time, was taken into custody at his mother's house and transported to a police station to be interviewed by area detectives.

¶ 7                                    B. The Interrogation

¶ 8      According to a timestamp on the videorecording of the interrogation, Dyvell was placed in a secure holding room at the police station at 4:13 p.m. on July 16, 2013. Dyvell sat there alone until 6:21 p.m., when three detectives—Adrian Garcia, Brian Tedeschi, and Anthony Noradin—entered the room and began questioning him.

¶ 9      While the entirety of Dyvell's interview with law enforcement was videorecorded, no unaltered copy of the footage exists in the record. The parties stipulated that, when reviewing the footage in anticipation of trial, an assistant state's attorney (ASA) made alterations to the original recording. The ASA was reviewing the original file, rather than a copy, and every time he hit pause, fast-forward, or rewind, he was making irreversible edits. While it appears that no segment of the interview was fully deleted, as a result of these alterations, the recording pauses repeatedly, skips forward at times, and occasionally moves in reverse. The timestamp alerts the viewer as to when this is happening.

¶ 10      Detective Garcia begins the interrogation by telling Dyvell that his mother was at the police station but had to leave. He then tells Dyvell that in her absence, Detective Noradin will serve as a "youth advocate" for Dyvell. Detective Garcia then reads Dyvell his *Miranda* rights and asks, "knowing your rights, do you want to talk to us?" Dyvell says "alright" in response. At this point, Detective Noradin makes the only intervention he will make during the entirety of the interrogation, asking Dyvell to keep his voice up so that the other detectives can understand him.

¶ 11      Substantive questioning begins at 6:22 p.m. Detective Garcia asks Dyvell if he knows why he's there. Dyvell alludes to a shooting of "that boy" on Lawndale Avenue. Detective Garcia confirms that Dyvell is being accused of involvement in that shooting and asks where he was on July 8, 2013. Dyvell denies involvement. He claims that he was at home for most of that day and

that his mother and grandmother can confirm this.

¶ 12    Detective Tedeschi then takes over the interrogation and repeatedly tells Dyvell, "everyone out there [is] saying you shot him." He tells Dyvell that they have witnesses who already identified him from photo lineups, and others who claimed that Dyvell told them that he committed the murder. Detective Tedeschi asks that Dyvell provide a reason for why "everyone" had identified him as the shooter. Detective Tedeschi suggests to Dyvell that "maybe shit just went bad" and urges Dyvell to provide some explanation for why others are blaming him. In response, Dyvell repeatedly tells the detectives that he was not involved in any shooting.

¶ 13    At around 6:38 p.m., Detective Garcia takes the lead back from Detective Tedeschi. He says to Dyvell:

> "Here's the situation, you're pretty young and you've probably never dealt with us before, okay? You're not just brought in here to play a guessing game, okay? We brought you in after we talked to a lot of people, okay? Taken hand-written statements *** and I don't know if you're familiar with photo spreads, but we've taken your picture along with some other peoples' and they picked you out, okay? And that's why you were brought in today. Because we have enough evidence against you right now. And as Detective Tedeschi said, you're going to stand up in a lineup, and I guarantee you that you're going to be the one who's picked out as the person who shot that kid. You have a chance to explain your situation, instead of getting a bunch of f***ing people involved in this bullshit that you're telling us. You have a chance to explain yourself what happened that day so we can hear the truth."

¶ 14    Dyvell continues to deny involvement. Detective Tedeschi challenges Dyvell's denials, saying, "[y]ou did!" and "why did they say you did?" At this point in the interrogation, Dyvell

grows visibly upset and begins to cry. He continues to insist that he "did not kill nobody."

¶ 15    Detective Garcia then tells Dyvell, "like I told you, we're going to be bringing in the people you mentioned. One of them is going to be your grandma. How old is your grandma? She old? Because we're going to bring her in." Detective Tedeschi adds, "she's coming in, and we're going to find your mom, and she's going to come in. And they're going to sit there through this whole process." "Do you want to do that to your grandma?" asks Detective Garcia. Dyvell once again becomes visibly and emotionally distraught, saying, "I don't know what you're talking about man, I didn't do nothing. I just want to leave man."

¶ 16    Detective Tedeschi once again takes over the questioning, asking that Dyvell explain why other people have identified him as the shooter. During this exchange, Dyvell is sitting alone on the bench in the interrogation room, sobbing and hunched over with his head and arms withdrawn into his white t-shirt. At around 6:48 p.m., Detective Tedeschi walks over to sit down on the bench next to Dyvell. He tells Dyvell, "we're not putting anything on you. What we do is talk to people who were out there. And we were not there *** I was not there *** People out there are putting you out there. People out there are putting a gun in your hand."

¶ 17    At 6:49 p.m., Detective Tedeschi says, "I don't believe you meant to kill that boy." Dyvell slides down the bench away from Detective Tedeschi and shouts clearly, "I don't want to talk to you, bro." This marks the first point in the interview where Dyvell contends he invoked his right to remain silent. This is also a point in the recording where the alterations described above are prevalent. The video pauses and interrupts itself repeatedly. The following appears to the court to be what is reflected in the video at that moment. In response to Dyvell's statement of "I don't want to talk to you, bro," the following exchange ensues:

"Detective Garcia: What's that?

Dyvell: I don't want to talk to [inaudible].

Detective Garcia: I can't hear you, what?

Dyvell: I don't want to talk to him, bro.

Detective Garcia: You don't want to talk to him? [motioning to Detective Tedeschi]

Dyvell: No.

Detective Garcia: You want to talk to me? Dyvell? Do you want to talk to me?

Dyvell: [mumbling] I don't want to talk to anyone.

Detective Garcia: So you don't want to talk to anybody? Is that what you said Dyvell?

Dyvell: I don't want to talk to nobody, I don't want to talk to him.

Detective Garcia: Do you want to talk to me? Dyvell?

Dyvell: It don't matter man, it don't matter.

Detective Garcia: So you want to talk to me?

Dyvell: [head and arms still withdrawn into his t-shirt] I don't want to talk to him."

¶ 18     Detective Garcia then sits down on the bench and continues to question Dyvell. He again asks why people are blaming him for the shooting, and Dyvell answers by talking about a robbery that had occurred on July 4 that involved him and his cousin. Just after 7 p.m., the detectives leave, and Dyvell lies down on the bench in the interrogation room and cries before appearing to fall asleep. At 8:54 p.m., Detective Garcia reenters the interview room and gives Dyvell a slice of pizza. He also tells Dyvell that they have his cousin at the station. Dyvell responds that the interrogation room is cold, and Detective Garcia tells him he will look for a jacket. Detective Garcia then exits the interview room.

¶ 19     At 9:06 p.m., Detectives Garcia, Tedeschi, and Noradin reenter the room and renew their

questioning of Dyvell. Detective Garcia tells Dyvell several times that he "has to" give them an answer or explanation for why others have identified him as the shooter. Dyvell continues to say that he was uninvolved in the shooting. At one point, Dyvell states, "just do what y'all do then, y'all got evidence *** just call it a day, because I'm trying to tell y'all I didn't do it."

¶ 20    The detectives again talk about members of Dyvell's family. Detective Garcia says that his mother left because she "didn't even want to stick around" for him. Dyvell asks him how he knows that, and he responds, "because she was here and she left." At 9:22 p.m., Detective Tedeschi tells Dyvell, "you're sixteen years old *** save yourself," and he urges him to tell his side of the story. Detective Tedeschi repeats that he has multiple people identifying Dyvell as the shooter, saying they circled his photo and said, "Dyvell is the shooter!" At 9:23 p.m., Dyvell stands up from the metal bench and yells at the detectives, "[m]an just give me my stuff so I can go to sleep, man. Just, don't talk to me no more! I don't know why, I don't know why, I don't! I do not know why!" At this point, Detective Garcia stands up and heads for the door. He grabs the doorknob, but stays in the room, as Detective Tedeschi continues to ask questions and Dyvell repeats that he does not know why people are blaming him for what happened. The detectives leave the room at 9:26 p.m.

¶ 21    At 9:59 p.m., Detective Tedeschi, Detective Noradin, and a new detective, Detective Demosthenes Balodimas, enter the interrogation room. Detective Balodimas now takes the lead. Dyvell continues to say that he did not shoot anyone, but his story begins to change. Whereas earlier he had told detectives he was at his cousin's house when he heard about the shooting, now he tells them he was at his own house. At 10:19 p.m., Detective Balodimas tells Dyvell, "I think what you just told us may be 50% of the truth, you know you have to get to 100% of the truth." The detectives then tell him his story does not make sense and they continue to ask for an explanation for why multiple people saw him in the area at the time of the shooting. They

repeatedly tell Dyvell that maybe it was an accident, that maybe he was just trying to frighten the boys on the corner by firing shots into the air. At 10:28 p.m., Detective Balodimas tells Dyvell that he's getting closer to the truth, that now he's told him 90% of the truth. "Do you know what 10% you're leaving out? You walked down the sidewalk and tried to scare these boys." The detectives tell him again to save himself and tell them the truth.

¶ 22    At 10:39 p.m., Dyvell admits for the first time to being present when the shooting occurred, saying, "I didn't shoot the gun but I was with the person who shot the gun." Moments after this admission, Detective Tedeschi crouches down, stares Dyvell in the eyes, and tells him, "we know you are not a killer. Look at me, man. I know you are not a killer, look at me. I know you're not a killer. A lot of people who sat on this bench were hardcore f****** murderers. You are not a murderer. You're a sixteen year old kid who did something stupid *** you have a chance to rectify this mistake." He continues "you are not a hard killer. You are not a murderer. You're a young kid who made a bad decision." At 10:41 p.m., Dyvell slowly begins to tell them about an individual named "Big Homie" who, the day of the shooting, offered him $25,000. Dyvell then admits to firing off "3 or 5" shots towards a group of people standing across the street. At 10:51 p.m., the detectives leave the room. At 10:57 p.m., Detectives Balodimas, Garcia, and Noradin re-enter the interrogation room, and Dyvell tells the detectives that "Big Homie" was threatening to kill his cousin, but that Dyvell could "do [him] a favor" and do the shooting.

¶ 23    At 11:04 p.m., Dyvell asks to speak to his mother. The detectives ask him for his mother's telephone number and leave the room. At 11:21 p.m., Detective Garcia reenters the room and informs Dyvell that he has left Dyvell's mother a voicemail message.

¶ 24    At 12:57 p.m. the next day, Dyvell's mother is escorted into the room to spend a few minutes alone with her son. She tells him that she knows he is innocent, that she had gotten him a

lawyer, and that he should not say anything to the detectives. Dyvell cries and tells her that he did not do it.

¶ 25    On August 22, 2013, Dyvell was charged by grand jury indictment for murder, felony murder, attempted murder, and aggravated discharge of a firearm in connection with the July 8, 2013, shooting.

¶ 26                                  C. The Motion to Suppress Hearing

¶ 27    On March 23, 2015, Dyvell's counsel filed a motion to suppress his custodial statement, arguing the statement was (1) obtained in violation of state law governing the video and audio recording of confessions, (2) the involuntary product of police coercion, (3) a violation of *Miranda* due to failure to warn, and (4) obtained after Dyvell had invoked his right to remain silent.

¶ 28    On December 13, 2017, a pre-trial hearing was held on Dyvell's motion. Detective Garcia and Yvonne Mallet, Dyvell's mother, testified. Before the hearing began, the court informed the parties that it had viewed all the video recordings of Dyvell's statements.

¶ 29    The State called Detective Garcia, who testified that on July 16, 2013, he spoke with Dyvell in an interview room following his arrest that same day. Because Dyvell was a juvenile, Detective Garcia spoke with Yvonne Mallet at the station prior to initiating the interrogation. Detective Garcia told Ms. Mallet that her son was in custody and that she had to be present at all times during the interrogation. Detective Garcia also told Ms. Mallet that the interview was being recorded. He did not tell her what crime her son was being questioned about. Detective Garcia then told Ms. Mallet to wait outside the detectives' office area on the first floor while he went upstairs to check that the interrogation room and her son were ready. He testified that when he returned some 15 minutes later, Ms. Mallet was gone. Detective Garcia testified that he searched the entire station for her, as well as the parking lot, but could not find her. Because he could not find her, Detective

Garcia summoned Detective Noradin to serve as Dyvell's youth advocate during the interrogation. Detective Garcia explained that Detective Noradin's role was to provide Dyvell with advice during the interrogation if he needed it.

¶ 30    Detective Garcia next testified that he read Dyvell his *Miranda* rights prior to speaking with him. He testified that he notified Dyvell that he could be charged, tried, and sentenced as an adult. Dyvell stated that he understood his rights and proceeded to speak with the detectives about the shooting throughout the evening. Detective Garcia further testified that the recording system was activated during the interview and that detectives do not have access to the recording system.

¶ 31    On cross-examination, Detective Garcia said he did not recall if he ever advised Dyvell that he also had a right to have a parent or guardian with him during questioning. Detective Garcia also acknowledged that the youth advocate, Detective Noradin, never sat down with Dyvell or attempted to explain anything to him during the interrogation.

¶ 32    After Detective Garcia finished testifying, the State entered copies of the video recordings of Dyvell's interrogation into evidence. The parties stipulated that the "manipulated" recordings of the interrogation were not the result of malfunctioning recording equipment in the interrogation room, but rather due to the actions of an ASA as he reviewed the recordings to take notes. The State then rested, and Dyvell moved for a directed finding based on the altered condition of the video recordings and because he was illegally interrogated after he invoked his right to remain silent. The court denied the motion.

¶ 33    The defense then called Yvonne Mallet, who testified that she arrived at the station on the day of her son's arrest and that she notified the detectives that her time was limited because she had borrowed someone else's car to get to the station as fast as she could. The detectives told her to wait. She reiterated that she could not wait because she needed to get the borrowed car back to

its owner, who was threatening to report it as stolen. She also asked to see her son when she first arrived but was refused access. Ms. Mallet testified that she waited about 15 minutes before she left to return the car. She returned to the station on the following afternoon. She testified that she was not contacted by the police to return to the station but returned of her own accord. She was finally allowed to speak with her son alone, but she later learned that by this point, he had already made an inculpatory statement.

¶ 34 The State argued that the alterations to the recordings of Dyvell's interrogation had not been intentionally made and that even in their current state, the video clips were still the substantial equivalent of an unaltered recording. The State further argued that Dyvell failed to unequivocally invoke his right to silence because, as the recordings clearly showed, he only announced a desire to cease speaking with Detective Tedeschi in particular. Finally, the State argued that Dyvell's statements were voluntary. While the video showed moments where Dyvell experienced emotional outbursts, nothing the detectives did rose to the level of impropriety.

¶ 35 In response, defense counsel focused largely on the altered quality of the recordings, but also argued that Dyvell had, in fact, invoked his right to silence when he said he did not want to talk to the officers. Defense counsel also argued that Dyvell, a 16-year-old boy, should not have had to say "I'm invoking the 5th amendment" but rather that his actions showed a clear desire to remain silent.

¶ 36 The trial court denied Dyvell's motion to suppress. In announcing its ruling, the court reiterated that it had reviewed the approximately 12 hours of recordings of Dyvell's interrogation. The court acknowledged that while the videos were altered and "herky-jerky," they were nonetheless "substantially accurate" and clearly showed that Dyvell made voluntary statements to the detectives, thereby satisfying Illinois law governing the recording of interrogations. The court

concluded that Dyvell did not "fully and unequivocally" invoke his right to remain silent during the interview because his desire to cease questioning was directed solely at Detective Tedeschi. On this point, the court explained its reasoning as follows:

"The law requires that the invocation of the right to remain silent must be clear, unambiguous, and unequivocal. His statement's not that. I would find that his waiver of *Miranda* was free and uncoerced. There's just these two ambiguous statements that the defendant alters [*sic*]: 'I don't want to talk to you, bro,' referring to the detective that I mentioned earlier, an individual—a particular individual within a room in which there are I think four adults other than the defendant.

The detectives ask—continue to ask the defendant questions in order to ascertain what exactly he meant by, 'I don't want to talk to you, bro,' in order to try to clarify this and make it less equivocal. And they ask the defendant pointedly and the defendant answered to that inquiry, It don't matter, about whether that officer should absent—the detective should absent himself from the interview room. * * *

* * *

I watched closely to tenor and manner in which he was questioned, the words that he said in conjunction with the questions that the detectives posed, and his general conduct or behavior during the course of the interview.

In this Court's view, the motion to suppress statements should be denied."

¶ 37                                                    D. Trial

¶ 38   At Dyvell's trial, held from April 22 to April 25, 2019, all three of the individuals Dyvell was accused of attempting to murder—Jerome Wordlaw, Paris Watson, and Spencer Jackson— testified as witnesses for the State. On direct examination, Mr. Wordlaw, who was also the brother

of the murder victim, Ed Cooper, testified that on July 8, 2013, at around 5 p.m., he was standing near the corner of Lawndale Avenue and Ohio Street with several other people, including his brother Ed, Mr. Watson and Mr. Jackson. Mr. Wordlaw was finishing a game of dice and Ed was finishing a game of basketball, when Mr. Wordlaw saw an African-American male with a slim build and dreadlocks walking towards them with a gun in his hand. Mr. Wordlaw testified that as this individual moved towards the group, he warned them, saying, "he got a gun. Run. He got a gun," at which point everyone scattered, running through a vacant lot as shots rang out. Mr. Wordlaw testified that Ed was running behind him when he heard someone else say, "[h]e hit." Mr. Wordlaw stopped and looked back to see his brother lying on the ground. Mr. Wordlaw then ran back to tend to Ed until the ambulance arrived to transport him to the hospital. He did not speak to police until two days after the shooting, on July 10, 2013. On that date, detectives showed him a series of photographs at the police station, and Mr. Wordlaw identified Dyvell as the shooter. A week later, on July 17, at around 1:20 a.m., Mr. Wordlaw also viewed an in-person line-up at the police station, where he again identified Dyvell as the shooter.

¶ 39 On cross-examination, Mr. Wordlaw admitted that he had about 20 seconds to observe the shooter as he was approaching the group, and that his attention was focused mostly on the gun and not the gunman's face. He also stated that he never looked back at the shooter once he took off running. Mr. Wordlaw acknowledged that he did not know Dyvell at the time of the shooting. He also admitted that he told an ASA at one point prior to trial that he had implicated Dyvell based on "word on the street."

¶ 40 Paris Watson testified that on July 8, 2013, at around 5 p.m., he was at the corner of Ohio Street and Lawndale Avenue with "Psych," "Spider," Jerome Wordlaw, Spencer Jackson, and a few others. He stated that Psych also had a gun, which he pulled out once the shooting started, but

he clarified that Psych never fired his weapon. He testified that the shooter came from an alley on Lawndale Avenue. Mr. Watson described the shooter as having short dread locks. He described the gun as "probably a revolver, black with a brown handle." He heard someone scream, "get down," and then about five or six shots were fired. After the shooting stopped, Mr. Watson got up and ran through the vacant lot. He recalled joining Mr. Wordlaw, who was tending to Ed. Mr. Watson then identified Dyvell in court as the shooter.

¶ 41    On cross-examination, Mr. Watson admitted that he did not speak to police on the day of the shooting, but rather the next day, July 9, 2013, after he was taken into custody for an unrelated offense. On that day, Mr. Watson identified Dyvell from a photo array as the shooter. On July 17, 2013, he also identified Dyvell in a line-up.

¶ 42    Spencer Jackson testified that he also saw a gunman approach him and the others gathered near the corner of Ohio Street and Lawndale Avenue on the evening of July 8, 2013. Mr. Jackson testified that right before the shots were fired, he grabbed Ed's shirt and the two began to run across Lawndale Avenue towards a vacant lot. He testified that there was a total of about nine to ten people near them at the time, and everybody took off running when they saw the gunman. As they ran through the lot, Mr. Jackson heard about five or six shots. He then heard someone yell, "[h]e got hit." Mr. Jackson then turned around and saw Ed lying on the ground right behind him.

¶ 43    On cross-examination, Mr. Jackson recalled that the gunman wore long dreads. He acknowledged that he did not get a good look at the gunman's face as the dreads covered his face.

¶ 44    The parties stipulated that Ed Cooper died of a gunshot wound to the chest. A discharged bullet fragment was recovered from his body during the autopsy. This fragment was consistent with a bullet fired from a revolver. No firearm was recovered from the scene, nor were any cartridge casings.

¶ 45    Detective Garcia testified regarding his interactions with Yvonne Mallet on July 16, 2013, consistently with his prior testimony at the motion to suppress hearing.

¶ 46    The State then introduced the video recordings of Dyvell's interrogation, beginning with the segment where Detective Garcia read Dyvell his *Miranda* rights at 6:19 p.m. Detective Garcia authenticated the video and identified the people appearing in it. Shortly after the State began to play the recording for the jury, the court stopped the proceedings, asked for a sidebar, and questioned the State about the poor quality of the recordings. The judge who presided over the suppression hearing had since retired, the case had been reassigned, and the trial judge was apparently unaware of the problem with the video recordings. The court told the State that it would need to explain to the jury why the recording quality was disjointed and constantly interrupted by pauses. Defense counsel restated his objection to the recording's admissibility because of the edits. The trial judge told the parties to stipulate to an explanation of the video's poor quality for the jury. When trial resumed, the parties stipulated to the following:

"Judge, at this time, the parties would have a further stipulation *** and that stipulation would be that the audio and video that the jury is seeing now, People's Exhibit Number 38, was created by [an ASA] *** while he was at Area North in kind of real time. He was fast-forwarding, pausing, rewinding in order to take those notes at the time he was watching the video. So what is being shown with pauses, rewinding and fast-forwarding is what was created by [an] ASA *** at that time and it's not being stopped, paused or rewinded [*sic*] here in court. That's actually the work that he was doing at the time and that was how it was preserved."

¶ 47    The State then played the recording for the jury and asked Detective Garcia a few follow-up questions related to the operation of the recording equipment and the officers in the room with

Dyvell during the interrogation. Detective Garcia reiterated that detectives do not have access to the recording equipment or recordings themselves upon activating the recording system.

¶ 48     On cross-examination, Detective Garcia stated again that he spoke with Ms. Mallet upon her arrival at the police station on July 16, 2013. He also confirmed that Mr. Watson was himself questioned in connection with the July 8, 2013, murder after he had been arrested and taken into custody for an unrelated drug offense.

¶ 49     The State then called Detective Balodimas, who testified that he was one of the detectives appearing in the video. Through Detective Balodimas, the State introduced the portions of the videorecording where Dyvell admitted to shooting a gun at the behest of an individual known as "Big Homie."

¶ 50     On cross-examination, Detective Balodimas acknowledged that Dyvell had been in the locked interview room for over six hours by the time he implicated himself in the shooting. Detective Balodimas also acknowledged that Detective Noradin, Dyvell's youth advocate, never spoke with Dyvell, nor offered him any advice. The State then rested.

¶ 51     Dyvell called several members of his family as defense witnesses. His uncle, Preston Mallet, testified that he remembered seeing his nephew resting on a futon or couch in the front room of their home at around noon on July 8, 2013. He also testified that he saw Dyvell there at 5 p.m. that day as well.

¶ 52     On cross-examination, Preston Mallet admitted to having a past felony conviction from 2013. He also claimed that he first learned that Dyvell had been charged with first degree murder at 7 p.m. on the night of the shooting. He acknowledged that it could have been 4 p.m. or 5 p.m. when he saw Dyvell on the couch on the afternoon of July 8, 2013, and agreed that he only saw him briefly.

¶ 53    The defense next called Dyvell's aunt, Kimberly Guyton. Ms. Guyton testified that she lived at the same residence as Dyvell, his mother, and Preston Mallet. Ms. Guyton testified that she was at home all day on July 8, 2013, and, echoing Preston Mallet's testimony, she explained that she saw Dyvell arrive home around 6 a.m. and go to sleep on the futon or couch in the front room. She also testified that he got up to go to the corner store for about five minutes at around 1 p.m. and then went back to sleep on the futon at around 4 p.m. She testified that she was on the computer in the front room by the futon when Dyvell went to sleep, and that she woke him up at around 5 p.m. because he received a phone call from a cousin.

¶ 54    On cross-examination, Ms. Guyton admitted that Dyvell may have left for the store multiple times, but that she only remembered seeing him leave for the store and return around 1 p.m. that day. She also stated that there was a girl on the couch with Dyvell when she came out of her room at around 4 p.m. to use the computer. Ms. Guyton also acknowledged that she never told the police her account of the day's events, but that she had talked to Dyvell and his attorney prior to the trial.

¶ 55    Dyvell's mother, Yvonne Mallet, testified that she was at home on July 8, 2013. At around 5 p.m., she was sitting on the couch playing with her newborn granddaughter, and Dyvell was asleep on the couch in the living room. Ms. Mallet testified that her sister, Ms. Guyton, was in the front room on the computer at that time as well. Ms. Mallet recalled that Dyvell left the house at around 3 p.m. to run to the store on an errand for her brother Preston, but that he returned home shortly thereafter and went to sleep on the couch. Her testimony regarding her interactions with Detective Garcia on July 16, 2013, was consistent with the testimony she gave at the motion to suppress hearing.

¶ 56    Dyvell then took the stand in his own defense. He testified that on the afternoon of July 16,

2013, he was sitting at home with other family members when the police entered his home and arrested him. He acknowledged that prior to being interrogated, one of the detectives read him his *Miranda* rights, but insisted that no one ever explained to him what those rights meant. Dyvell testified that he initially told the detectives the truth when he repeatedly denied his involvement.

¶ 57 His testimony was that, on the morning of July 8, 2013, he arrived at his mother's house at around 7 a.m. He then went to sleep until his uncle woke him up later that day to go to the store. When he returned from the store, Dyvell went back to sleep. Later that day, his cousin called him and told him about a shooting. Dyvell testified that he slept at home throughout the rest of that day and never left his house except to run to the store with his uncle.

¶ 58 Dyvell explained that the police interrogated him for hours and kept insisting that he was lying about his activities on the day of the shooting because others had implicated him in the shooting. Dyvell said the detectives suggested to him how the shooting occurred, and that he adopted their theory into his statements later during the interrogation after the detectives repeatedly pressured him and told him that his own mother wanted nothing to do with him. He maintained that he was not near the scene of the crime at the time of the shooting and that he never shot anyone.

¶ 59 The State in its closing argument began by asking the jury to consider "how much is a life worth?" The State then referred to a portion of Dyvell's inculpatory statement, explaining that he considered a life to be worth "$25,000," the amount he said "Big Homie" had promised to pay him to commit the shooting. The State then highlighted the testimony of the three eyewitnesses to the shooting—Mr. Wordlaw, Mr. Watson, and Mr. Jackson—arguing that they had identified someone matching Dyvell's description as the shooter and that they had also made in-court identifications of Dyvell.

¶ 60 The State highlighted excerpts from Dyvell's videotaped confession. The State argued,

"[n]ow, we don't only have the three eyewitness testimonies *** we have the videotaped confession of the defendant. Now, you heard that videotaped confession. You saw it. You heard the defendant admit that he did the shooting, that he was out there." The State then replayed a portion of Dyvell's confession for the jury, reiterating that his statements supported a finding that he had intended to kill the individuals standing at the dice game on July 8, 2013.

¶ 61    Dyvell's defense counsel sought to undermine the credibility of the State's three eyewitnesses, arguing that Mr. Wordlaw was biased as his brother was the homicide victim in the case, that Mr. Watson had given his statement only after being arrested for an unrelated incident, and that Mr. Jackson had not gotten a good look at the shooter. Addressing the confession, counsel focused on the circumstances surrounding the interrogation, and argued that Dyvell's statements were the product of the detectives' suggestions.

¶ 62    The jury found Dyvell guilty on all counts. On October 1, 2019, the court sentenced Dyvell to a total of 43 years in prison: 35 years for the murder to run consecutively to 8 years for the three attempted murder counts. The court declined to impose a firearm enhancement.

¶ 63    On November 6, 2019, the court denied Dyvell's motion to reconsider his sentence. This appeal followed.

¶ 64                                II. JURISDICTION

¶ 65    The trial court denied Dyvell's motion to reconsider his sentence on November 6, 2019, and Dyvell timely filed a notice of appeal that same day. We have jurisdiction over this appeal under article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rules 603 (eff. Feb 6, 2013) and 606 (eff. July 1, 2017), governing appeals from final judgments in criminal cases.

¶ 66                                III. ANALYSIS

¶ 67    Dyvell raises four issues on appeal. First, he attacks the admissibility of his inculpatory statements, arguing both that his interrogators failed to honor his right to remain silent after he had invoked it and that his statements were not voluntary. Second, Dyvell argues the trial court erred in admitting the altered recordings of his statements. Third, he argues the State failed to meet its burden of proving him guilty beyond a reasonable doubt on the attempted murder charges. And fourth, Dyvell argues that his prison sentence of 43 years was excessive and imposed without proper consideration of all statutory mitigating factors.

¶ 68                          A. The Right to Remain Silent

¶ 69    Dyvell's first argument on appeal is that the trial court erred in denying his motion to suppress his custodial statement where his interrogators failed to scrupulously honor his right to remain silent after he unequivocally invoked it. For the reasons that follow, we agree.

¶ 70    As a general matter, when reviewing a trial court's denial of a motion to suppress, we apply the bifurcated standard announced by the United States Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699 (1996), and adopted by our own supreme court in *In re G.O.*, 191 Ill. 2d 37, 49-50 (2000). Under this standard, we accord great deference to the trial court's findings of fact and will only reverse those findings if they are against the manifest weight of the evidence, but we review *de novo* the ultimate legal question of whether, based on those facts, the denial of the motion to suppress was proper. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001).

¶ 71    In *People v. Flores*, 2014 IL App (1st) 121786, ¶ 35, we explained that where a trial court's decision on a motion to suppress is based on video recordings of a defendant's interrogation, and not on live testimony, the appropriate standard of review is *de novo* because "we are reviewing the same evidence the trial court reviewed." Here, unlike in *Flores*, the trial court did hear some live

testimony at the hearing on the motion to suppress. However, in our view, the reasoning from *Flores* still applies because, on the specific issue of whether Dyvell invoked his right to remain silent, the tape itself is determinative. The trial court acknowledged that its determination on the *Miranda* issue was based on what the "tape clearly show[ed]." Accordingly, as we have access to the same materials the trial court considered in making its ruling, and "neither the facts nor the credibility of witnesses is at issue," we review the trial court's determination that Dyvell did not invoke his right to remain silent *de novo. People v. Nielson*, 187 Ill. 2d 271, 286 (1999).

¶ 72                              1. Invoking the Right to Remain Silent

¶ 73     Both the federal and Illinois constitutions prohibit the state from compelling an individual to be a witness against himself in a criminal prosecution. U.S. Const. amend. V; Ill. Const. 1970, art. I, § 10. To protect this right, it is axiomatic that once an "individual indicates in any manner at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *People v. Edwards*, 301 Ill. App. 3d 966, 977 (1998) (citing *Miranda v. Arizona*, 384 U.S. 436, 473-74 (1966)). "[A]ny statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or otherwise." *Miranda*, 384 U.S. at 474.

¶ 74     As we explained in *People v. Kronenberger,* 2014 IL App (1st) 110231, ¶ 33 (citing *Berghuis v. Thompkins*, 560 U.S. 370, 381 (2010)), "an invocation of the right to silence must be unambiguous, unequivocal and clear." A defendant may invoke this right either verbally or through nonverbal conduct that clearly indicates his desire to end questioning. *Flores*, 2014 IL App (1st) 121786, ¶ 37 (citing *People v. Hernandez*, 362 Ill. App. 3d 779, 785 (2005)); see also *People v. Nielson*, 187 Ill.2d 271, 287 (1999) (finding that the defendant invoked his right to remain silent by placing his hands over his ears, shaking his head, and saying, "nah nah nah"). If invoked verbally, the "demand to end the interrogation must be specific." *Hernandez*, 362 Ill. App. 3d at

785.

¶ 75    On appeal, Dyvell asserts that the trial court erred in denying his motion to suppress, as his invocation of his right to remain silent "could not have been more clear and unequivocal." Specifically, Dyvell highlights the portion of his interrogation described above, *supra* ¶ 16, beginning when Detective Tedeschi comes over and sits next to him on the metal bench, causing him to respond, "I don't want to talk to you, bro." Dyvell maintains that "[s]everal times in this time span, [he] repeatedly and unequivocally invoked his right to remain silent" and each time he did so, "detectives did not immediately halt the interrogation but simply ignored the invocations and continued to badger [him], repeatedly insisting that he was involved in the shooting." Additionally, later on during his interrogation, at 9:23 p.m., Dyvell said "don't talk to me no more," addressing the detectives as a group. See *supra* ¶ 20.

¶ 76    The State insists that none of the portions of the interrogation highlighted reveal a clear and unequivocal desire to end all questioning. Rather, according to the State, Dyvell was only expressing his desire not to talk to one detective in particular, Detective Tedeschi. As the State puts it in its brief:

> "Defendant's statements simply revealed his desire to cease interacting with Detective Tedeschi, who had been pressing him about his involvement in the shooting. Defendant replied multiple times that he did not want to talk to 'him' referring to Tedeschi. Although defendant at one point stated that he did not want to talk to 'nobody,' he immediately clarified that he did not want to talk to 'him,' again clearly referring to Detective Tedeschi. Based on the totality of the circumstances, defendant's repeated statements evidencing a desire to cease interacting with Detective Tedeschi cannot reasonably be construed as an unambiguous assertion of his desire to cease communication with all members of law

enforcement."

¶ 77    In support of this argument, the State cites to our supreme court's decision in *People v. Cole*, 172 Ill. 2d 85, 96-97 (1996). In *Cole*, a suspect arrested in connection with a double murder waived his *Miranda* rights and gave an initial videotaped statement to Missouri state troopers. *Id.* at 96. Later, in a subsequent interview, which included interrogators from both the Missouri State Police and the Federal Bureau of Investigation (FBI), the FBI agents told the suspect that details from his prior statement were at odds with the physical evidence being gathered. *Id.* In response, the suspect, making a gesture towards the FBI agents, responded "I don't want to talk to you guys." *Id.* After the FBI agents left the room, the suspect proceeded to give a new statement to the remaining interrogators, all of whom were from the Missouri State Police, in which he admitted that he included falsehoods in his prior statement. *Id.* On appeal, the defendant argued that because his interrogators continued to question him after he stated, "I don't want to talk to you guys," his *Miranda* rights were violated and his second statement should have been suppressed. Our supreme court disagreed, explaining,

> "We believe that the reference to 'you guys' meant agents from the FBI, and that the defendant's refusal to talk applied only to the FBI agents. This conclusion is reinforced by other testimony presented at the suppression hearing. Earlier that evening, prior to the appearance of the FBI agents, the defendant told a Missouri officer that he would talk to the State troopers but not to the FBI. Following the departure of the FBI agents, the defendant called his grandfather, a former police officer, and was overheard saying that he did not want to talk to the FBI but that the Missouri officers were treating him well and that he would tell those officers the truth. Accordingly, we do not believe that the defendant asked that all questioning cease; the defendant's request was limited to interrogation by the

FBI, and that request was honored." *Id.*

¶ 78    This case is quite different from *Cole.* In *Cole* there were two distinct groups of law enforcement personnel who wanted to question the defendant and the evidence was clear that the defendant wanted to talk to one of them and not the other. As our supreme court explained, statements made before the interrogation, during the interrogation, and during the defendant's later call to his grandfather clarified that when the defendant said, "I don't want to talk to you guys," he was referring only to the FBI. *Id.*

¶ 79    In contrast, in this case, the police officers questioning Dyvell were all one group, representing the same law enforcement agency. Also, immediately after his comment about not talking to "him," where he was presumably referring to Detective Tedeschi, Dyvell then mumbled "I don't want to talk to anyone." Then, in response to Detective Garcia's question, he stated again, "*I don't want to talk to nobody.*" Dyvell repeated his desire to stop the questioning when, at 9:23 p.m., he commanded "don't talk to me no more!" Thus, unlike the defendant in *Cole*, Dyvell made it clear that he did not want to talk to any of the officers interrogating him.

¶ 80    When an individual clearly and specifically invokes his *Miranda* rights, questioning must cease. Interrogators are not permitted to ask additional questions that are designed to or have the effect of getting a defendant to second guess that invocation. The United States Supreme Court specifically addressed this common police tactic in *Smith v. Illinois*, 469 U.S. 91, 97-98 (1984), where it held that "*postrequest* responses to further interrogation may not be used to cast retrospective doubt on the clarity of the initial request itself." (Emphasis in original.) While *Smith* involved the invocation of the right to counsel and not the right to remain silent, in *Flores* we applied the reasoning in *Smith* to a defendant's invocation of his right to remain silent. 2014 IL App (1st) 121786, ¶ 38.

¶ 81     In *Flores*, police arrested a 17-year-old defendant in connection with a murder investigation. *Id.* ¶ 31. During the interrogation, detectives told the defendant that his co-defendant had talked to them already regarding the murder. *Id.* Detectives then asked, "[y]ou want to talk to us about that?" to which the defendant replied, "not really, no." *Id.* Questioning continued and thirty minutes later the defendant admitted to being the shooter. *Id.* ¶ 34. On direct appeal, the defendant argued that he had invoked his right to silence when he said, "not really, no," and that the trial court had erred in denying his motion to suppress on that basis. *Id.* ¶ 2. The State argued that when the defendant said, "not really, no," he was referring only to his unwillingness to speak about his co-defendant, not communicating his unwillingness to speak with law enforcement about other matters. *Id.* ¶ 55. We found that "not really, no" was a clear invocation of the defendant's right to remain silent and that the State, as in *Smith*, could not point to statements made by the defendant after that clear invocation to cast doubt on it retrospectively. On this basis, we reversed and remanded the case for a new trial. *Id.* ¶ 63.

¶ 82     We reached a similar conclusion in *People v. Hernandez*, 362 Ill. App. 3d 779 (2005). In *Hernandez*, after speaking to an ASA and providing an incriminating off-the-record statement about his involvement in a murder, a defendant agreed to repeat his statement on video. *Id.* at 781. When the tape was rolling, the ASA summarized what the defendant had previously told her and then read him his *Miranda* rights. The following exchange then occurred:

> "Q. Understanding these rights, do you wish to talk to us now?
>
> A. No, not no more.
>
> Q. Do you wish to talk to us now about what we previously spoken to?
>
> A. Yes." *Id.* at 782.

The defendant then went on to provide an incriminating statement about his role in the murder. *Id.*

Reviewing a transcript of this exchange, we held that "no, not no more" was a clear invocation of the defendant's right to remain silent. *Id.* at 786.

¶ 83 Similarly, in *People v. Brown*, 171 Ill. App. 3d 993, 999 (1988), a 16-year-old defendant made an incriminating off-the-record statement to an ASA and agreed to repeat the statement before a court reporter. After the defendant was readvised of his *Miranda* rights, the following exchange between the ASA and the defendant took place:

> "Q: All right. Understanding these rights do you wish to talk to us now?
>
> A: No.
>
> Q: Pardon me?
>
> A: I didn't understand.
>
> Q: Understanding these rights, do you wish to talk to us now?
>
> A: Well, I already told you what happened.
>
> Q: All right. After you told me before about what happened I informed you that I was going to call a court reporter and we were going to take it down in writing, is that correct?
>
> A: Yes, sir.
>
> Q: Now, I've advised you of your rights. Understanding these rights do you wish to talk to us now about the incident involved on the 30th of June 1983 involving the shooting death of Renaldo Reyes?
>
> A: Yes." *Id.* at 995.

¶ 84 On appeal, the defendant argued that when he uttered "no," questioning should have ceased, as this was a clear and unequivocal invocation of his right to remain silent. The State argued that it could not be said that the defendant clearly and unequivocally invoked his right to

remain silent because after the "no," it becomes clear that the defendant was answering a specific question about whether he understood his rights rather than communicating a general desire to cut off all questioning. We rejected the State's argument, explaining that "the fact that his oral response was not accompanied by a stronger oral statement or physical manifestations does not make his response of 'No' any less decisive or clear." *Id.* at 997. We also rejected the State's efforts to use subsequent statements made after the defendant uttered "no" to cast doubt on whether he meant to end his questioning, explaining that this interpretation was:

> "merely a possible, as well as a convenient, interpretation based upon the State's own 'clarification' through a series of subsequent questions which were amenable to the possibility of manipulation of the wording of those questions to obtain the desired 'clarification.' The fact remains, however, that defendant stated that he did not want to talk to the Assistant State's Attorney and clearly indicated so based on his response 'No' to the State's corresponding question. Questioning should have ceased at that point." *Id.* at 998.

¶ 85    This case is strikingly similar to *Flores*, *Hernandez*, and *Brown*. As in those cases, we find that when Dyvell stated flatly that he did not want to talk to anyone (*supra* ¶ 17), this constituted a clear and unequivocal invocation of his right to remain silent. A second invocation occurred later when Dyvell said "Just, don't talk to me no more!" *Supra* ¶ 20. At each of these points, questioning should have ceased. By continuing to question Dyvell, law enforcement failed to "scrupulously honor" his rights as *Miranda* requires. The trial court erred in denying his motion to suppress on this basis. This brings us to the issue of remedy.

¶ 86                    2. The *Miranda* Violation Was Not a Harmless Error

¶ 87    The improper admission of a defendant's statements is subject to harmless error review. *People v. Wilson*, 2020 IL App (1st) 162430, ¶ 57. While the State made no harmless error

argument in its brief, it did raise harmless error during oral argument. Under Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020), it is not permissible for the State to raise an argument for the first time at oral argument. *People v. McCoy*, 2014 IL App (2d) 130632, ¶ 28 ("Arguments omitted from the appellee's brief and raised for the first time at oral argument are forfeited."); see also *People v. Gregory*, 2016 IL App (2d) 140294, ¶ 29 (noting that where "the State bears the burden of showing harmless error and has failed to make any such argument in its brief, it has forfeited any harmless-error analysis."). However, since forfeiture is a limitation on the parties, but not on the court, "we may exercise our discretion to review an otherwise forfeited issue." *Hanmi Bank v. Chuhak & Tecson, P.C.*, 2018 IL App (1st) 180089, ¶ 20. Exercising that discretion here, we consider the issue and conclude that the improper admission of Dyvell's confession was not harmless.

¶ 88    Under a harmless error analysis, "the critical question is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict." *Wilson*, 2020 IL App (1st) 162430, ¶ 57 (citing *People v. Patterson*, 217 Ill. 2d 407, 428 (2005)). Due to their "extreme probative weight," the admission of unlawfully obtained confessions is "rarely harmless error." *People v. Harris*, 2012 IL App (1st) 100678, ¶ 76. Considering the persuasive power of confession evidence generally and the way the State directly and repeatedly referred to Dyvell's statement in closing argument, we find that the admission of the statement was not harmless beyond a reasonable doubt.

¶ 89    In *People v. R.C.*, 108 Ill. 2d 349, 355-56 (1985), after determining that a 15-year-old's invocation of his right to silence was not scrupulously honored, our supreme court held that the admission of his statement was not harmless error, explaining its reasoning as follows:

"[I]n determining whether a constitutional error is harmless beyond a reasonable doubt, '[t]he focus should * * * be upon the character and quality of the illegally obtained evidence as it relates to the other evidence bearing on the same issue and the court should appraise the possible impact upon the jury of the wrongfully obtained evidence.' [Citation.] *** Clearly, R.C.'s statement was the foundation of the State's case. Equally clearly, a confession is the most powerful piece of evidence the State can offer, and its effect on a jury is incalculable. We therefore cannot say that the improper admission of R.C.'s statement was harmless beyond a reasonable doubt." (Quoting *People v. Black*, 52 Ill. 2d 554, 555 (1972)).

¶ 90     Here, as in *R.C.*, Dyvell's inculpatory statement was damning evidence at trial. The State dramatically began its closing by asking the jury to consider "how much is a human life worth?" Then, referring directly to the statement, the State told the jury that Dyvell thought that Ed Cooper's life was worth $25,000. The State also replayed parts of the video during argument.

¶ 91     Recently in *People v. Salamon*, 2022 IL 125722, ¶¶ 126-130, our supreme court held that admission of an inculpatory statement that the court found was "involuntary and should have been suppressed" (*id.* ¶ 130), was nonetheless harmless error. However, the defendant in *Salamon*, in addition to making an inculpatory statement to police, had also confessed to a friend of his who later testified, and details of that non-custodial admission were corroborated by other witnesses. Thus, the court concluded that "the substance of defendant's videorecorded confession was cumulative and duplicated other evidence that was properly admitted at trial." *Id.* ¶ 127. In this case, in contrast, the only inculpatory statement Dyvell made was the one he made in custody so the admissions here were in no sense cumulative.

¶ 92     While the State had evidence beyond Dyvell's confession—specifically the three

eyewitnesses who identified Dyvell as the shooter—we cannot say that without the confession, the State's evidence was so overwhelming that no fair-minded jury could have returned a vote of acquittal. Considering the "incalculable" effect that a defendant's confession has on a jury, and our supreme court's recognition that a confession is the "most powerful piece of evidence the State can offer," we simply cannot conclude that the error of admitting Dyvell's statement, taken in violation of his *Miranda* rights, was harmless beyond a reasonable doubt. *R.C.*, 108 Ill. 2d at 356. In sum, the trial court erred in denying Dyvell's motion to suppress and this error was not harmless. We therefore reverse the trial court's denial of Dyvell's motion to suppress and remand the case for a new trial.

¶ 93    As we are remanding for a new trial at which the videorecorded statement will not be admitted, we need not address the issue of the altered state of the videorecording or Dyvell's argument that he received an excessive sentence.

¶ 94    However, to avoid any possible double jeopardy violations, we will address his remaining argument on the sufficiency of the evidence on the attempted murder convictions and also consider the evidence supporting his conviction for first degree murder. See *People v. Lopez*, 229 Ill. 2d 322, 367 (2008) (explaining that where a case is reversed because of admission of improper evidence, a remand for retrial "raises double jeopardy concerns, and we are therefore required to consider the sufficiency of the evidence against defendant."). For the purposes of double jeopardy, "all evidence submitted at the original trial," including erroneously admitted evidence, "may be considered when determining the sufficiency of the evidence." *People v. Olivera*, 164 Ill. 2d 382, 393 (1995).

¶ 95                                B. Sufficiency of Evidence

¶ 96    Dyvell challenges the sufficiency of the evidence on his three convictions for attempted

murder. As we explained in *People v. Viramontes*, 2017 IL App (1st) 142085, ¶ 52, to sustain a conviction for attempted murder, the State must prove beyond a reasonable doubt that (1) the defendant performed an act constituting a substantial step toward the commission of the murder, and (2) the defendant possessed the criminal intent to kill the victim. Further, "[b]ecause attempted murder is a specific intent offense, it must be proven defendant had the specific intent to kill." *Id.* Proof of specific intent "may be inferred from the circumstances, such as the character of the assault on the victim and the use of a deadly weapon." *Id.* (citing *People v. Jones*, 184 Ill. App. 3d 412, 429 (1989)).

¶ 97    Here, without question, there was sufficient evidence to support a finding that Dyvell performed an act constituting a substantial step toward the commission of a murder where the jury heard evidence that Dyvell fired three to five shots towards a group of people gathered near a vacant lot. He argues, however, that his convictions should be reversed because the State failed to prove the mental element of the offense, that he possessed the specific intent to kill any of the three complainants. In support of this argument, he notes that "[t]here was no evidence that [he] made any threats to kill anyone, nor that he was specifically aiming at anyone when he allegedly fired multiple shots towards the vacant lot where a number of people were nearby." He further argues that "the opportunity to kill was such that if [he] had possessed the specific intent to kill any of the three complainants, he could have done so." We are not persuaded by this argument.

¶ 98    While we have said in the past that "the firing of a gun, coupled with nothing more, is generally not sufficient to prove a specific intent to kill" (*People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001)), here there was something more. As the State explains in its brief, the evidence at trial established that Dyvell did not merely fire a gun, rather, there was evidence that he fired a gun, multiple times, in the direction of a crowd, after stealthily approaching from a distance. There

was also evidence that he continued shooting off rounds as the crowd scattered. In our view, such evidence, which went to the "character of the assault," supported a reasonable inference that Dyvell "intended the wilfully [*sic*] committed act, the direct and natural tendency of which is to destroy another's life." *Id.* After viewing this evidence in the light most favorable to the prosecution, we find that a rational jury could have found Dyvell guilty of attempted murder beyond a reasonable doubt. Accordingly, his retrial on these charges presents no double jeopardy impediment.

¶ 99    We reach the same conclusion regarding the evidence supporting the first degree murder conviction. Viewing the evidence presented in the light most favorable to the prosecution— evidence that included multiple identifications, testimony from three eyewitnesses, and Dyvell's own admissions which partially corroborated the eyewitness testimony—we find that there was sufficient evidence for a rational jury to find him guilty of first degree murder such that a retrial on this offense raises no double jeopardy impediment. We note, however, that neither of these findings is intended to be any suggestion by this court as to what the evidence would show on retrial. See, *e.g.*, *People v. Naylor*, 229 Ill. 2d 584, 610-11 (2008) ("[b]y this finding, however, we reach no conclusion as to defendant's guilt that would be binding on retrial.").

¶ 100                                  IV. CONCLUSION

¶ 101   For the foregoing reasons, we reverse the trial court's denial of Dyvell's motion to suppress and remand for a new trial where his inculpatory statement may not be used.

¶ 102   Reversed and remanded.